The TEXAS AERONAUTICS COMMIS-
SION et al., Appellants,

v.

BRANIFF AIRWAYS, INC., et al.,
Appellees.

No. 11655.

Court of Civil Appeals of Texas.

Austin.

March 12, 1969.

Rehearing Denied April 16, 1969.

Crawford C. Martin, Atty. Gen., Nola White, 1st Asst. Atty. Gen., James H. Cowden, Asst. Atty. Gen., Austin, Jacobsen & Long, Austin, Gates, Talbot, Morris & Merrell, Los Angeles, Cal., Matthews, Nowlin, MacFarlane & Barrett, Herbert D. Kelleher, San Antonio, for appellants.

Clark, West, Keller, Clark & Ginsberg, William B. West, III, Allen Butler, Dallas, McGinnis, Lochridge, Kilgore, Byfield, Hunter & Wilson, James W. Wilson, Austin, Verner, Liipfert & Bernhard, James M. Verner, Washington, D. C., Jack K. Ayer, Houston, Blanchette, Smith & Shelton, Joseph M. Shelton, Dallas, Clark, Thomas, Harris, Denius & Winters, Don-

ald S. Thomas, Martin Harris, Jerry Prestridge, Barry Bishop, Mary Joe Carroll, Austin, for appellees.

PHILLIPS, Chief Justice.

In November, 1967, Air Southwest Co. applied to the Texas Aeronautics Commission for a Certificate of Public Convenience and Necessity authorizing Air Southwest to provide scheduled commuter air service between the Texas cities of Dallas/Fort Worth, Houston and San Antonio. Thereafter, Air Southwest filed two amendments to its application setting forth the names of additional directors and shareholders of the Company.

The Commission permitted Braniff Airways, Inc., Continental Airlines and Trans-Texas Airways, Inc., to intervene in opposition to the granting of Air Southwest's application. A seven day hearing, beginning January 15, 1968, was then held before the Director of the Texas Aeronautics Commission. Upon motion of Braniff, Continental and Trans-Texas made orally at the conclusion of the hearing and subsequently submitted in writing, the Commission granted the parties leave to file briefs with the Commission and to argue the case orally before its members.

Each of the parties submitted a brief to the Commission, and, on February 20, 1968, oral argument took place before the Commission members sitting *en banc* in Austin.

The Chairman of the Commission thereafter announced that the six members of the Commission had unanimously determined to award a Certificate of Public Convenience and Necessity to Air Southwest in the form prayed for and requested that an appropriate order and certificate be prepared. Before this could be achieved, however, Braniff, Continental and Trans-

Texas filed suit against the Commission, its members and Director in the District Court of Travis County, Texas, praying that the order of the Texas Aeronautics Commission be set aside and seeking the issuance of, respectively, a temporary restraining order, temporary injunction and permanent injunction prohibiting the Commission, its members and Director from issuing a Certificate of Public Convenience and Necessity to Air Southwest. The trial court granted the temporary restraining order.

Subsequently, with the Court's permission, the Commission entered its order with a form of Certificate annexed thereto, but did not actually issue the Certificate. Air Southwest intervened in the appeal as a defendant, and the temporary restraining order was continued in effect by agreement of the parties and upon the condition that the hearing on appeal would commence at an early date.

The hearing began on March 25, 1968 and continued through May 10, 1968. At its conclusion, the court announced his decision to vacate the order of the Commission and to grant a permanent injunction restraining the Commission, its members and Director from issuing a Certificate of Public Convenience and Necessity to Air Southwest.

Judgment in the cause was entered on August 6, 1968, and this appeal by the State of Texas and Air Southwest is from that judgment.

We affirm this judgment.

I.

Appellants are before this Court with seven points of error, however, as we sustain Appellees' first counterpoint, we need not notice these points of error [1] with the

---

1. "Point of Error I: There is substantial evidence that there is a public necessity for the service proposed by Air Southwest and that the inauguration of such service would be in the interest of the public convenience.
Point of Error II: There is substantial evidence that Air Southwest possesses

exception of points VI and VII which complain, respectively, of evidence excluded and evidence admitted.

■ Appellees' first counterpoint is that the trial court correctly set aside the order of the Commission [2] because of the absence of substantial evidence that there is a public necessity for the service proposed by Air Southwest and that the inauguration of such service would be in the public interest.

We sustain this counterpoint.

Air Southwest intends to provide scheduled air service among and between the cities of Dallas/Fort Worth, Houston and San Antonio, Texas. At least initially, it would serve only these cities, utilizing four Electra turbo-jet aircraft purchased from American Airlines and seating 90 passengers each in a single class configuration. These are the same aircraft used by Braniff in these markets, except that Braniff's Electras are configured for both first class and coach seating.

Air Southwest places considerable emphasis on accommodating the "commuter" passenger who wishes to depart from one of the cities that it serves and to return thereto on the same day. It proposes to begin operations with eight flights per day between Dallas and Houston, six flights per day between San Antonio and Dallas/Fort Worth and four flights per day between Houston and San Antonio. As the air passenger market becomes stimulated by the addition of Air Southwest's service and the Company increases its penetration of that market, it intends to add additional flights so that by the end of its first year of operation it will be providing sixteen flights per day between Dallas/Fort Worth and Houston, twelve flights per day between San Antonio and Dallas/Fort Worth and eight flights per day between Houston and San Antonio. These will be its basic weekday schedules which will depart be-

the financial responsiblity, fitness and ability to warrant the issuance to it of a Certificate of Public Convenience and Necessity and that its proposed rates and charges will be adequate for the operation of its proposed service over its proposed routes.
Point of Error III: There is substantial evidence that a Certificate of Public Convenience and Necessity can be issued to Air Southwest without undue harm to existing air carriers and that the issuance of such certificate and the exercise of rights thereunder by Air Southwest will not irreparably harm the appellees.
Point of Error IV: There is substantial evidence that Air Southwest has complied and will comply, with the standards of operation of the Texas Aeronautics Commission, and there is substantial evidence to support the issuance of the Commission's Order granting a Certificate of Public Convenience and Necessity.
Point of Error V: The Order of the Texas Aeronautics Commission is not void for failure to state findings of fact.
Point of Error VI: The District Court erred by incorrectly excluding admissible evidence during the trial of this cause.
Point of Error VII: The trial court erred in permitting inadmissible evidence to be introduced."

2. A portion of the judgment of the trial court reads as follows:
"that there is no evidence and no substantial evidence that AIR SOUTHWEST CO. complied with the statutory requisites for securing a Certificate of Public Convenience and Necessity in that there is no evidence and no substantial evidence that there is a public necessity for the proposed service, no evidence and no substantial evidence that the proposed service would be in the interest of public convenience, no evidence and no substantial evidence that AIR SOUTHWEST CO. possesses such financial responsibility, fitness and ability as would warrant the issuance to it of a Certificate of Public Convenience and Necessity, no evidence and no substantial evidence that the proposed rates or charges would be adequate for the operation of the proposed service over the proposed routes, no evidence and no substantial evidence that a Certificate of Public Convenience and Necessity could be issued to AIR SOUTHWEST CO. without undue harm to existing carriers, and no evidence and no substantial evidence that AIR SOUTHWEST CO. has complied with the standards for operation which the Commission is required to prescribe."

tween 7:00 a. m. and 9:00 p. m., with emphasis on flights in the prime commuter hours of 7:00 a. m. to 9:00 a. m. and 4:00 p. m. to 7:00 p. m. Additional flights will be added on Friday afternoons and Sunday afternoons, which are historically periods of heavier than normal air travel.

The stage lengths sought to be flown by Air Southwest are 194 statute miles between Houston and San Antonio; 246 statute miles between Dallas/Fort Worth and Houston; and 260 statute miles between San Antonio and Dallas/Fort Worth. The average flying time between these pairs of cities will be 33 minutes on the Houston-San Antonio leg; 46 minutes on the Dallas/Fort Worth-Houston leg; and 46 minutes on the San Antonio-Dallas/Fort Worth leg. Air Southwest's aircraft in their 90 passenger seating configuration will provide more leg room and seat width than the coach sections of jets competing in the same markets.

The Company seeks to maintain a reservations service operating from a single central location in San Antonio to which all reservation calls, including those placed in Dallas, Forth Worth and Houston, will come directly. These calls will be monitored by an automatic call director which stacks the calls, shows how many are waiting, and would enable Air Southwest to promptly vary the number of reservations personnel in accordance with demand.

It desires to sell tickets through independent travel agents in Texas, who will be paid a 7% commission on each sale, which is 2% higher than the commissions paid by competing airlines. Prepunched IBM tickets will be issued to regular customers. These tickets may simply be presented at the passenger boarding gate, and they do not require that any information be written thereon. At the end of each month, the prepunched tickets, identified by customer code number and destination, are processed through an IBM computer which computes the customer's bill for that month. Moreover, tickets could be purchased at

airport counters, at the passenger boarding gate or on the airplane itself in flight. Tickets at the airport counters could be issued by a cash register utilizing two different colors of tape, so that the counter agent need only punch the destination and hand the passenger his ticket, which is cut off the tape by the register in the manner of a ticket for a bus trip. All credit cards, except the universal air travel card, would be honored for the purchase of tickets. Air Southwest could not, and would not, "interline" with any interstate air carriers, which means that it would not sell tickets on such carriers to passengers traveling beyond Houston, Dallas/Fort Worth or San Antonio. This is not to say, however, that the Company cannot, or would not, carry such passengers who chose to separately purchase an Air Southwest ticket to travel between its four cities as part of their overall journey, and its independent travel agents obviously could and would sell separate tickets on Air Southwest and on other carriers covering journeys to Houston, Dallas/Fort Worth or San Antonio and beyond.

Air Southwest would provide curbside check-in facilities for baggage, would accept luggage check-ins at its passenger boarding gates and would permit baggage to be carried aboard its aircraft by the passenger. There would be no weight limitation on the amount of baggage that can accompany each passenger.

Air Southwest would spend $400,000 per year in cash and offer $200,000 worth of tickets by way of exchange for advertising solely in, and of, the Houston, Dallas/Fort Worth and San Antonio markets. It would also employ a salesman in the cities on its routes and promote recreational travel and tours to its cities and the areas surrounding them.

The Company would charge full fares of $14.95 between Houston-Dallas/Fort Worth and San Antonio-Dallas/Fort Worth and of $12.95 between Houston-San Antonio. It would also offer military

standby and children's fares of $8.10 between Houston-Dallas/Fort Worth and San Antonio-Dallas/Fort Worth and of $7.10 between Houston-San Antonio. These fares would be available on all of the Company's flights, at any time of day or night and on any day of the week.

On the San Antonio-Dallas/Fort Worth stage, Air Southwest would nominally compete with three other carriers, American Airlines, Braniff and Trans-Texas. Of these three, only Braniff has unrestricted authority from the Civil Aeronautics Board permitting it to operate a non-stop flight serving solely Dallas/Fort Worth-San Antonio and, in fact, most of its service consists of long haul, through flights originating and/or terminating in other cities in the United States and/or Mexico. Trans-Texas is required to serve an intermediate stop in either direction between Dallas/Fort Worth-San Antonio, and American Airlines' flights in either direction serves Mexico City on each trip.

On the San Antonio-Houston leg, Air Southwest would nominally compete with five other carriers, American Airlines, Braniff, Continental, Eastern Airlines and Trans-Texas. Again, however, of these five, only Braniff and Eastern have unrestricted authority permitting them to serve solely these markets on a non-stop basis, and Eastern does not utilize this authority at all, while Braniff has but one non-stop a day serving only these cities. American Airlines' flights between San Antonio and Houston must also serve California as part of their itinerary, and each of Continental's is required to serve an out of state point as well. Trans-Texas must operate without subsidy on non-stop flights between these two cities, and its flights are required to serve points beyond either Houston or San Antonio.

Braniff and Trans-Texas are the only two competing carriers on the Houston-Dallas/Fort Worth stage, and both of them have substantially unrestricted authority. Many of their flights nonetheless, are medi-

um and long haul in nature, serving cities other than those under consideration.

In addition, Air Southwest maintains that it will be subject to the same Federal Aviation Agency rules, regulations, requirements, supervision and inspection as the other major interstate airlines involved herein under Part 121 of the Federal Air Regulations.

Appellants vigorously maintain that there is a need for their proposed service inasmuch as their reservations would all be made through a central office in San Antonio; that their tickets could be purchased quickly and efficiently without waiting at airline counters as they would be prepunched IBM tickets; that these fares would be cheaper than those presently charged by the competing carriers; that they could be purchased at the "gate" or even after boarding their aircraft; that their passengers would take their baggage with them onboard thus doing away, to a considerable degree, with lost baggage.

Appellants contend that in 1967, the latest year for which figures were available, Braniff cancelled 4.44%, or 243, of its flights from Houston to Dallas/Fort Worth and 14.27%, or 780, were more than fifteen minutes late. During the same period, Trans-Texas cancelled 5.15%, or 98, of its flights, and 23.29%, or 443, were more than fifteen minutes late. Coming in the other direction, from Dallas/Fort Worth to Houston, Braniff cancelled 4.28%, or 228, of its flights, and 31.83%, or 1,697, were more than fifteen minutes late. 4.86%, or 91, of Trans-Texas' Dallas/Fort Worth to Houston flights were cancelled and 21.44%, or 401, were more than fifteen minutes late. Overall, the Braniff and Trans-Texas flights in this air corridor were either late, or cancelled, 27.32% of the time during 1967, which means that almost one-third of the time air travelers either did not fly at all or were substantially late in arriving. In December, 1967, for instance, Trans-Texas scheduled 573 flights, of which fully 38 were cancelled and 287 were more than fifteen

minutes late, for a record of only 43% arriving and on time.

Appellants further contend that a major cause of the poor on-time performance of the airlines presently serving this triangle is the fact that so many of their flights originate outside of the market area Appellants seek to serve and are subject to delays not occurring in the area itself.

Appellants point out that their advertising would be slanted to encourage flights within the proposed triangle rather than the interstate character of advertising presently used by the interstate carriers with whom they propose to compete.

Appellants then describe the economic factors in the proposed market as having a population in excess of five million people with a total effective buying income of over eleven and one-half million dollars. That between 1960 and 1965 the population in what they designate as their primary market area grew at a rate of 17.36% or more than twice as great as Texas as a whole which was 6.81%. That the Texas Water Development Board predicts that by 1980 the population of the primary markets in question will have expanded to 6,727,084 persons or a 77.44% gain since 1960. That according to the U. S. Department of Commerce, through the year 1975 both the population of Texas and the total value of goods and services the State produces will grow at a rate seventeen percent greater than the forecast for the nation as a whole.

Appellants presented the market projections of a Mr. C. W. Pope, Sr. of San Antonio, their principal market witness, who testified that the entry of Appellants' services into the proposed triangle would "stimulate" the market so that by 1970 there would be 1,249,415 passengers in the Houston, San Antonio, Dallas/Fort Worth markets rather than 1,012,519 should this proposed service be denied. This would be an increase of 236,896, or roughly 23%.

Mr. Pope put great emphasis on the ability of Appellants to "stimulate" the market

through lower fares and the various advantages claimed above. He forecast that after a reasonable time or, after achieving "full market identity" Appellants would carry 60% of the origin and destination passengers between San Antonio and Houston, 50% of such passengers between San Antonio and Dallas/Fort Worth and 37.5% between Dallas/Fort Worth and Houston. This would be a system wide average of 49.1%.

Mr. Pope's forecasts were vigorously challenged by Appellees as having been arrived at by highly unorthodox methods; that he used factors to obtain these results that were patently incorrect, resulting in a forecast that was unrealistic, incorrect and even absurd.

Appellants then presented evidence of four commuter markets in the United States these being San Francisco-Los Angeles, New York-Boston, New York-Washington and Boston-Washington. Their purpose here was to show that in spite of areas served by the large interstate airlines, there was a need for the commuter services in these areas; that the services were financially successful signifying that they had generated tremendous volumes of additional passengers. In this respect Appellants stressed the highly successful operation of Air California which operates principally between Los Angeles and San Francisco.

It should be pointed out here that this case took some five weeks to try and has a statement of facts numbering nearly three thousand pages. Appellants' market projections brought out principally through Mr. Pope's testimony comprises a substantial part of this record especially when Appellees' cross examination and rebuttal testimony is added thereto.

We have not ignored this testimony, however, we have not stated it in the detail that would be required should we believe it to be decisive. We do not believe it so to be under our view that Appellants have not made their case for public convenience and

necessity or to state it more simply, a need for the proposed service. This does not mean that many of the advantages to the traveling public that Appellants assert will come to pass should they be granted a certificate are illusory, however, this Court is bound by the law of *stare decisis* with respect to what the law requires a prospective carrier to prove before it can enter into competition over a given route with presently certified carriers.

## II.

This suit was brought under the provisions of Tex.Rev.Civ.Stat.Ann. art. 46c–6, which is generally concerned with the powers and duties of the Texas Aeronautics Commission. Subdivision 3 of this article states the necessary requirements for the issuance of a certificate to a carrier as follows:

"* * * As to the economic regulations promulgated, the Commission shall take into account the financial responsibility of the carrier, the public convenience and necessity for the proposed service, routes, proposed rates or charges, the effect on existing carriers, and any other factors bearing a relation thereto and pertaining to the public interest and necessity. * *"

■ We agree with both parties hereto that the case is governed by the substantial evidence rule and so hold. Subdivision 3 of Article 46c–6 states, in part:

"Any interested party, affected by the Commission's final order to the state

courts shall be entitled to a trial de novo on all facts and circumstances involved in such matter."

We hold that the trial de novo provisions are to be construed in the light of the holding of the Supreme Court in Board of Water Engineers v. Colorado River Municipal Water District, 152 Tex. 77, 254 S.W.2d 369 (1963) and the cases therein cited.

■ In this case the public need and the public interest cannot be considered merely as a whole but must be considered upon a route by route basis. Railroad Commission v. Red Arrow Freight Lines, 167 S.W.2d 249 (Tex.Civ.App. Austin 1943, writ ref'd w. o. m.).

It is clear from the controlling statute itself, that the Legislature intended that the route-by-route interpretation which this Court had placed on the Motor Carrier Act be applied to the Certificates of Public Convenience and Necessity which the Texas Aeronautics Commission was authorized to issue under the Air Carrier Act. Tex.Rev. Civ.Stat.Ann. art. 46c–6, Subdivision 3, requires that the Commission's determination be based, among other things, upon the "routes" which the applicant seeks to serve. The same section [3] further requires that copies of the application be served upon any air carrier serving "the same, or substantially the same, routes." Moreover, the Commission is authorized to grant or deny a Certificate "in whole or in part." Unquestionably, the fact that the Legislature authorized the Commission to grant the Cer-

3. "Any applicant for an intrastate certificate of public convenience and necessity shall file a signed. verified original and six (6) conformed copies of an application therefor and shall transmit the same by certified mail to the Commission's headquarters, Austin, Travis County, Texas, addressed to the Director. Such application shall set forth any pertinent facts or data required under this Act, or required by the rules, regulations and orders of the Commission. Copies of such application shall be contemporaneously transmitted to the Civil Aeronautics Board, the Federal Aviation Agency (or

its or their successors), and to any air carrier which is serving, or which has applied for permission to serve, the same, or substantially the same routes. After receipt of such application the Commission shall set a date for hearing which may be conducted by the Commission, or at its direction, by the Director, or any other staff member of the Commission, but the final determination shall be made by the Commission and shall be evidenced by a final written order granting or denying such certificate in whole or in part."

tificate for which application was made "in whole or in part," constituted a requirement that the Commission make a separate determination upon the basis of each route proposed to be served. The phraseology of the Act itself, thus, makes it clear that the Legislature intended and required that the Texas Aeronautics Commission approach its determination on applications for Certificates of Public Convenience and Necessity in the same manner in which the Railroad Commission, following this Court's construction of the statute involved in Red Arrow above.

This would have been the proper approach for the Commission to have followed in arriving at its decision. Railroad Commission v. Jackson, 157 Tex. 32, 299 S.W.2d 266 (1957).

It is apparent from the evidence that each and every segment which Appellants propose to serve is already being served so adequately that there is no substantial evidence indicating either a need or a convenience for additional service.

The following from Official Airline Guide, Quick Reference Edition, February 1, 1968, entered into evidence, summarizes the 52 daily schedules between Dallas/Fort Worth and Houston:

"

| | Southbound | | | | Northbound | | |
|---|---|---|---|---|---|---|---|
| | Flite | Departure | | | | Flite | Departure | |
| Carrier | No. | Time | Equip | Carrier | No. | Time | Equip |
| BI | 151 | 12:45A | B–727 | BI | 192 | 7:00A | B–727 |
| BI | 289 [1] | 7:05A | B–111 | TT | 940 [3] | 7:25A | DC–9 |
| TT | 945 [2] | 7:20A | DC–9 | BI | 62 | 7:50A | B–720 |
| BI | 185 | 7:45A | B–727 | BI | 280 [1] | 8:30A | B–111 |
| TT | 911 [1] | 8:10A | DC–9 | TT | 944 [2] | 8:30A | DC–9 |
| TT | 941 [2] | 8:35A | DC–9 | TT | 922 | 9:05A | DC–9 |
| BI | 85 | 9:00A | B–727 | BI | 126 | 9:30A | B–727 |
| BI | 239 | 10:10A | L–188 | BI | 122 | 10:45A | B–727 |
| TT | 943 | 10:30A | DC–9 | BI | 58 | 12:00N | B–707 |
| BI | 165 | 11:40A | B–727 | TT | 954 | 12:10P | DC–9 |
| TT | 973 | 12:15P | DC–9 | TT | 914 | 12:55P | DC–9 |
| BI | 385 [2] | 12:40P | L–188 | BI | 150 [2] | 1:30P | B–727 |
| BI | 381 | 1:40P | L–188 | BI | 152 | 2:00P | B–727 |
| BI | 63 | 3:00P | B–720 | BI | 352 [2] | 3:20P | L–180 |
| BI | 221 | 4:00P | L–188 | BI | 242 | 3:25P | B–111 |
| TT | 906 | 4:35P | DC–9 | TT | 916 | 4:00P | DC–9 |
| BI | 169 | 5:15P | B–727 | TT | 901 | 4:40P | DC–9 |
| TT | 917 | 5:30P | DC–9 | BI | 232 | 4:45P | B–727 |
| BI | 125 | 6:05P | B–727 | BI | 40 | 5:00P | B–720 |
| BI | 137 [2] | 6:50P | B–727 | BI | 384 | 5:45P | L–188 |
| TT | 949 | 6:50P | DC–9 | TT | 946 | 5:45P | DC–9 |
| TT | 919 | 7:50P | DC–9 | BI | 164 | 6:30P | B–727 |
| BI | 67 | 7:55P | B–720 | BI | 190 [2] | 7:45P | B–727 |
| BI | 59 | 9:40P | B–707 | TT | 948 [2] | 8:00P | DC–9 |
| TT | 902 [2] | 10:25P | DC–9 | TT | 920 | 8:55P | DC–9 |
| BI | 585 | 10:45P | L–188 | BI | 580 | 11:05P | L–188 |

[1] Except Sunday
[2] Except Saturday
[3] Except Saturday & Sunday

**708**

The following 37 Daily Schedules between Dallas/Fort Worth and San Antonio taken from the same source as the schedule set out above and entered in evidence is as follows:

"

| Southbound | | | | Northbound | | | |
|---|---|---|---|---|---|---|---|
| | Flite Departure | | | | Flite Departure | | |
| Carrier | No. | Time | Equip | Carrier | No. | Time | Equip |
| BI | 573 | 12:45A | B–111 | BI | 114 | 6:35A | B–727 |
| BI | 543 | 3:35A | B–720 | BI | 12 | 7:05A | B–720 |
| BI | 193 | 7:00A | B–727 | BI | 16 | 8:30A | B–720 |
| BI | 291 | 8:25A | L–188 | BI | 392 | 10:15A | L–188 |
| BI | 397 | 9:20A | L–188 | TT | 936 | 10:45A | DC–9 |
| TT | 935 | 10:00A | DC–9 | BI | 4 | 10:55A | B–720 |
| BI | 51 | 11:20A | B–320 | AA | 58 | 11:10A | B–7F |
| BI | 7 | 11:50A | B–720 | BI | 390 | 11:50A | L–188 |
| TT | 927 | 12:35P | DC–9 | BI | 376 | 1:00P | L–188 |
| TT | 633 | 1:25P | C–6 | BI | 66 | 1:45P | B–720 |
| BI | 57 | 2:10P | B–720 | TT | 928 | 2:45P | DC–9 |
| BI | 181 | 3:05P | B–727 | BI | 154 | 3:30P | L–188 |
| BI | 273 | 5:40P | B–111 | BI | 6 | 4:00P | B–720 |
| BI | 183 | 6:00P | B–727 | BI | 182 | 5:10P | B–727 |
| TT | 639 | 6:40P | C–6 | BI | 50 | 6:45P | B–320 |
| BI | 3 | 7:20P | B–720 | BI | 298 | 9:55P | B–111 |
| BI | 153 [1] | 8:00P | B–727 | BI | 542 | 11:30P | B–727 |
| AA | 25 | 9:15P | B–7F | TT | 912 | 11:40P | DC–9 |
| BI | 5 | 9:40P | B–720 | | | | |

[1] Except Saturday

"

◆

The following 37 Daily Schedules between Houston and San Antonio is taken from the same source as the two schedules set out above and was entered into evidence:

"

| Westbound | | | | Eastbound | | | |
|---|---|---|---|---|---|---|---|
| | Flite Departure | | | | Flite Departure | | |
| Carrier | No. | Time | Equip | Carrier | No. | Time | Equip |
| CO | 55 | 12:40A | B–2F | AA | 162 | 12:10A | B–7F |
| EA | 447 | 5:21A | B–720 | CO | 56 | 3:50A | B–2F |
| CO | 51 | 7:00A | B–2F | AA | 350 | 6:00A | B–2F |
| AA | 163 | 7:50A | B–7F | CO | 54 | 6:05A | B–2F |
| CO | 65 | 8:25A | B–2F | BI | 142 | 7:00A | B–727 |
| TT | 936 | 9:45A | DC–9 | EA | 50 | 7:15A | B–720 |
| CO | 153 | 10:30A | DC–9 | BI | 194 [1] | 11:00A | B–727 |
| BI | 239 | 11:30A | L–188 | TT | 935 | 11:38A | DC–9 |
| EA | 51 [1] | 11:47A | B–727 | CO | 152 | 1:24P | DC–9 |
| CO | 105 | 12:15P | DC–9 | CO | 126 | 1:55P | DC–9 |
| EA | 69 | 12:58P | B–727 | CO | 52 | 2:15P | B–2F |
| CO | 157 | 3:10P | DC–9 | AA | 146 | 2:40P | B–2F |
| CO | 67 | 4:00P | B–2F | EA | 126/268 | 4:45P | B–727 |
| AA | 143 | 4:25P | B–2F | CO | 147 | 6:29P | DC–9 |
| AA | 359 | 5:40P | B–2F | TT | 478 | 7:50P | C–2 |
| CO | 159 | 7:00P | DC–9 | CO | 158 | 9:45P | DC–9 |
| BI | 145 | 8:35P | B–727 | EA | 450 [1] | 10:55P | B–727 |
| TT | 912 | 10:40P | DC–9 | CO | 122 | 11:12P | DC–9 |
| | | | | CO | 66 | 11:45P | B–2F |

[1] Except Saturday

"

One of Appellants' arguments pertaining to convenience and necessity was inadequacy of present service during "rush hours" or during the most heavy periods of the day. The following is a schedule of "rush hour" schedules, entered into evidence showing the proposed service of Appellants.

"HOUSTON—DALLAS
'Rush Hour' Schedule

| Northbound Houston to Dallas | | Southbound Dallas to Houston | |
|---|---|---|---|
| **Morning** | | **Morning** | |
| 7:00 | Braniff jet | 7:05 | Braniff jet |
| 7:25 | T.T.A. jet | 7:20 | T.T.A. jet |
| 7:50 | Braniff jet | 7:45 | Braniff jet |
| 8:00 | Air Southwest Electra * | 8:00 | Air Southwest Electra * |
| 8:30 | T.T.A. jet | 8:10 | T.T.A. jet |
| 8:30 | Braniff jet | 8:35 | T.T.A. jet |
| 9:05 | T.T.A. jet | 9:00 | Braniff jet |
| 9:30 | Braniff jet | 9:45 | Air Southwest Electra * |
| 9:45 | Air Southwest Electra * | 10:10 | Braniff Electra |
| 10:45 | Braniff jet | 10:30 | Air Southwest Electra * |

* Proposed

| Northbound Houston to Dallas | | Southbound Dallas to Houston | |
|---|---|---|---|
| **Afternoon** | | **Afternoon** | |
| 1:30 | Braniff jet | 1:40 | Braniff Electra |
| 2:00 | Braniff jet | 2:50 | Braniff jet |
| 3:45 | Braniff jet | 4:00 | Braniff Electra |
| 4:00 | T.T.A. jet | 4:30 | Air Southwest Electra * |
| 4:30 | Air Southwest Electra * | 4:35 | T.T.A. jet |
| 4:40 | T.T.A. jet | 5:15 | Braniff jet |
| 4:45 | Braniff jet | 5:30 | T.T.A. jet |
| 5:00 | Braniff jet | 6:00 | Air Southwest Electra * |
| 5:45 | Braniff jet | 6:05 | Braniff jet |
| 5:54 | T.T.A. jet | 6:50 | Braniff jet |
| 6:00 | Air Southwest Electra * | 6:50 | T.T.A. jet |
| 6:30 | Braniff jet | 7:50 | T.T.A. jet |
| 7:45 | Braniff jet | 7:55 | Braniff jet |
| 8:00 | T.T.A. jet | | |

* Proposed                                                      "

———◆———

In addition to the extensive flight schedules set out above, the majority of these flights arrive and depart with a goodly percentage of their seats unsold and empty.

There are 4,352 available daily seats in the Houston-Dallas market. In January, 1968 Trans-Texas had an average of 671 empty seats per day between Houston and Dallas, and, during the same month, there was a daily average of 1301 empty seats on the Braniff flights between Houston and Dallas. This included an average of 227 daily empty seats for Braniff between 7 a. m. and 9 a. m. "rush" hours and 277 daily empty seats during the afternoon "rush" hours between 4 p. m. and 7 p. m.

The existing carriers provide 22 non-stop flights daily between Dallas/Fort Worth and San Antonio. Braniff had a daily average of 1098 empty seats between Dallas and San Antonio during January, 1968, and an average of 205 empty seats during the morning "rush hours" between 7 a. m. and 9 a. m. and an average of 125 daily empty seats during the afternoon "rush hours." The daily empty Braniff seats are equivalent to 17 empty twin-engine jets.

There are 37 daily flights between Houston and San Antonio. Braniff, which serves this market together with Trans-Texas, Continental, Eastern and American, was able to fill only 30.1 percent of its seats during January, 1968 with an average of over 241 empty seats daily. Continental's highest load factor on an eastbound flight occurred in January, 1967 and on that flight the load factor was only 42.8% leaving the plane considerably less than one half full.

Thus it is apparent that Appellants' argument concerning public convenience and necessity is not based upon facts as they existed at the time the Commission entered the order, or as they exist at present but is based in the main upon projections into the future. Their evidence as to the alleged inconveniences inflicted upon the public by the Appellee carriers is evidence as to present conditions and will be dealt with later in this opinion.

■ It is well established that in any appeal under the substantial evidence rule, the courts must consider the situation as it existed at the time the administrative agency entered the order in question. Magnolia Petroleum Company v. New Process Production Company, 129 Tex. 617, 104 S.W.2d 1106 (1937); Railroad Commission v. Shell Oil Company, 139 Tex. 66, 161 S.W.2d 1022 (1942); Blair v. Board of Trustees, Trinity Independent School District, 161 S.W.2d 1030 (Tex.Civ. App. Galveston 1942, no writ); and Southern Canal Company v. State Board of Water Engineers, 159 Tex. 227, 318 S.W.2d 619 (1958).

■ Adequacy of existing service in transportation cases requires the denial of application for new service. The Supreme Court in Railroad Commission v. Jackson, 157 Tex. 32, 299 S.W.2d 266 (1957), explained that (299 S.W.2d 268–269):

"The theory underlying the statutes applicable to motor carriers is that the public interest is better served by regulated rather than by excessive or destructive competition and in determining the issue of public convenience and necessity requisite to the creation of a 'new service' consideration must be given to the competitive effect upon presently operating carriers in the area and their continued ability to render effective public service. Texas & Pacific Ry. Co. v. Railroad Commission, Tex.Civ.App., 138 S.W.2d 927, reversed on other grounds, 138 Tex. 148, 157 S.W.2d 622, cited with approval in Steele v. General Mills, 329 U.S. 433, 67 S.Ct. 439, 91 L.Ed. 402; Texas Motor Coaches v. Railroad Commission, Tex. Civ.App., 41 S.W.2d 1074; Id., Tex.Civ. App., 59 S.W.2d 923, affirmed 123 Tex. 517, 73 S.W.2d 511. As bearing upon this issue, the record discloses that there are now six through carriers operating between Amarillo and Lubbock."

This holding applies here where five carriers are already serving the Houston-San Antonio route which Air Southwest seeks to serve; three carriers are already serving the Dallas-San Antonio route which Air Southwest seeks to serve; and two carriers are providing abundant service in vigorous competition on the Dallas-Houston segment which Air Southwest seeks to serve. Because of a showing of adequacy of existing service, the Supreme Court in Miller v. Railroad Commission, 363 S.W.2d 244 (Tex.1963), held that there was no substantial evidence to support an order granting a Certificate of Public Convenience and Necessity. That portion of the opinion reads in part (363 S.W.2d 246–247):

"We hold also that the order granting the certificate is invalid for lack of support by substantial evidence. * * *

The evidence adduced by petitioners established, prima facie, that the services and facilities of the existing specialized motor carriers for transporting roadway construction materials were adequate and that there was no public necessity for the proposed service."

Also applicable is the decision in Railroad Commission v. National Transport Corporation, 363 S.W.2d 360 (Tex.Civ. App. Austin 1963, writ ref'd n. r. e.). In affirming the judgment of the trial court there setting aside the certificate which the Commission had ordered, this Court wrote (363 S.W.2d 364):

> "Existing carriers are entitled to transport all of the traffic in the area of their authority as long as they can do so in a reasonably adequate manner, and until it be shown by substantial evidence that the existing carriers cannot adequately handle the traffic, there is no basis upon which new and competing operating rights can be granted."

And further in this same opinion, this Court said:

> "The Trial Court did not usurp the functions of the Commission, but did upon the basis of the testimony find that the action of the Commission in granting the orders was not supported by substantial evidence, and we believe properly so.
>
> Robertson Transports, Inc., et al. v. Transport Co. of Texas et al., Tex.Civ. App., 269 S.W.2d 472, err. ref. n. r. e."

Appellants presented seven witnesses who testified in their behalf. Of the seven, four were from San Antonio. The first witness from San Antonio was the executive Vice President of San Antonio's fair, Hemisfair; the second was a lawyer who is President of the Airline Passengers Association; the third was the Executive Director of the Alamo Area Council of Government; the fourth was the immediate past President of the San Antonio Chamber of Commerce. The remaining three were a State Senator and a teacher by profession, an investment banker and the President of a travel agency. Without going into detail with respect to this testimony, suffice to say that, while the tenor of the testimony was to the effect that present service is inadequate, these witnesses' assertions were too vague and general to formulate evidence of a nature substantial enough to cast any doubt whatsoever on the adequacy of service presented through the testimony of the appellees.

Nor does the evidence presented by Appellants purpose a superior service to that presently offered by Appellees. With respect to on-time performance, there is no reason to believe that their service will be immune from bad weather, crowded airport facilities or mechanical breakdowns. Obviously, with only four aircrafts that are used to begin with, any break down of one unit would seriously disjoint their entire schedule. With respect to the advantages of Appellants' proposed simplified ticketing, Trans-Texas has for several years had available an IBM ticket obviously similar to the type proposed to be used by Air Southwest. The ticket is pre-prepared and has the customer's name and account number on it. It is prepunched for billing purposes. The passenger can carry tickets in his pocket like a checkbook and, when he is ready to go somewhere, he can write his origin and destination on the ticket, make his reservation, enter his flight number and sign the ticket. All the passenger needs to do is to hand over the ticket and go to his airplane. For some reason, however, the testimony indicates that the public has not accepted this type of ticketing.

Trans-Texas also has another type of fast-draw ticket for credit card use. The ticket was designed to be used to expedite general travel and also to serve in emergency-type situations when a passenger might arrive at the last minute when the flight was ready to leave.

Braniff also has the fast-pack ticket. Any person can apply for credit and get fast-pack tickets from Braniff so that he can prepare his own. All the passenger needs to do is to make his reservation. He does not need to check in at the ticket counter but can go directly to the flight gate.

Appellants' description of the inconvenience of persons standing in long lines waiting to buy tickets is not convincing. In serving the Houston and Dallas market, the largest which Air Southwest proposes to serve, Trans-Texas maintains a separate ticket counter in Houston for its Dallas passengers so that they can purchase their tickets without any delay at all in waiting for others to buy more complicated tickets to more distant points. Tickets for Houston are sold in Dallas at the flight gate so that passengers do not even need to go to the main ticket counter to purchase their tickets for Houston.

Although Air Southwest has taken the position that its lower base fares will stimulate travel and encourage vacationing in Texas, it does not propose to offer either a confirmed youth fare or a family plan. The existing carriers all offer family fares which would provide progressively lower total fares as the number of members of the traveling family increased. Trans-Texas also offers a group fare which is available any time several persons are traveling together.

■ Furthermore, fares are subject to regulation and if it is in the public interest to lower them then they should be lowered. By adding service to already existing service, part of which is going begging, is not the answer. While "Public Convenience and Necessity" has not been construed by the Texas courts with respect to Tex.Rev. Civ.Stat.Ann. art. 46c–6(3) we see no reason why air travel should not be regulated under much the same standards and rules applicable to highway travel under the same phrase in the Motor Carrier Act, Tex. Rev.Civ.Stat.Ann. art. 911(a).

Appellants go somewhat further than this and contend that "public need" as used in the Savings and Loan Act[4] and "public necessity" as used in the banking Code[5] present much the same sort of "need" as "Public Convenience and Necessity" under the Motor Carrier Act. Then, we are cited to banking and savings and loan cases,[6] which, for the most part, are used to buttress Appellants' argument. Taking its cue from these cases, Appellants have presented their elaborate projections of what air travel will be in the future. Whatever may be the relevance of the banking and savings and loan cases here, in the cases cited the evidence overwhelmingly disclosed *presently* expanding markets coupled with projections indicating continued expansion. Consequently, in these cases the courts have either affirmed charters granted or reversed the Banking Board or the Savings and Loan Commissioner where charters were denied. In addition, where charters were granted, the evidence in these cases disclosed that the banks or savings and loan companies protesting the new charters had vastly *increased* their own deposits thus indicating that competition was needed in order to deter monopolies. State Banking Board v. Airline National Bank, 398 S.W.2d 805 (Tex.Civ.App. Austin 1966, no writ). The evidence in these cases is certainly incompatible with the "empty seat" evidence presented by the protestants here.

■ We hold that in considering this record as a whole there is no substantial evidence existing at the time of the entry of the order to uphold the order of the Commission as to the need for the additional service. Consequently, there is no public convenience and necessity for the proposed service under the act. Since such finding must be in the affirmative to uphold the order under the act, the order must fall. Art. 46c–6(3); Gibralter Savings &

4. Article 852a, Sec. 2.08(3) V.A.C.S.

5. Article 342–305, V.A.C.S.

6. Principally: Gerst v. Nixon, 411 S.W. 2d 350 (Tex.1966); Chimney Rock National Bank of Houston v. State Banking

Board, 376 S.W.2d 595 (Tex.Civ.App. Austin 1964); Gerst v. Houston First Savings Association, 422 S.W.2d 514 (Tex.Civ.App. Austin 1967, no writ); Phillips v. Brazosport Savings & Loan Ass'n, 366 S.W.2d 929 (Tex.1963).

Loan Association v. Falkner, 371 S.W.2d 548 (Tex. 1963).

Appellants' point of error number VI is that of the court in incorrectly excluding admissible evidence during the trial of this cause.

We overrule this point.

The evidence excluded was a public opinion survey conducted by three women either by telephone or person to person interviews. The purpose of the poll was to ascertain whether those interviewed saw a real need for the proposed service, whether they would find it more convenient and whether, should it be put into operation, they would fly more frequently. Due to the position we have taken on this case it becomes unnecessary for us to decide on the admissibility of public opinion polls.

Appellants' point of error number VII is that of the trial court in permitting inadmissible evidence to be introduced.

We overrule this point.

The court permitted appellees, over objection, to admit into evidence a want ad from the Dallas Morning news, wherein Appellants were purportedly seeking airline reservations help in a "Type 40" category at $485 plus. Appellants contend that the ad in question does not state the airline involved, the type of job to be performed, the place where the position is to be filled, etc. Consequently, it is hearsay testimony. We hold that if the admission was erroneous it was harmless error under Tex.R.Civ.P. 434.

Appellees have a cross point to the effect that the trial court erred in failing to hold that the granting of the Certificate of Public Convenience and Necessity sought by Air Southwest and operation thereunder would be unconstitutional as a burden on interstate commerce and in conflict with federal law.

Due to the disposition we have made of this case, further dissertation would be useless.

We affirm the judgment of the trial court.

Affirmed.

O'QUINN, Justice (dissenting).

In my opinion there is in the record substantial evidence to support the decision of the Texas Aeronautics Commission to award a certificate of public convenience and necessity to Air Southwest for the operation proposed in its application.

Traditionally the literature of dissent enjoys greater freedom, less restraint, than the cautious pronouncements of the majority. But this is a license that in this case need not be indulged. My purpose is to state briefly my most impelling reasons for dissenting. No attempt will be made to marshall all the evidence composing substantial support for the order of the Commission.

The record in this case, as pointed out by the majority, embraces nearly 3,000 pages of testimony adduced at a trial lasting more than a month. A substantial part of the record consists of studies and market projections offered by the applicant through C. W. Pope, Sr., who qualified as an expert, together with the cross examination and rebuttal testimony resulting from this evidence.

The Commission heard and obviously believed the testimony of Pope. The Commission heard the challenges of the protesting airlines claiming that Pope's forecasts had been arrived at by highly unorthodox methods, that he used patently incorrect factors to obtain these results, and that the forecast was unrealistic, incorrect, and even absurd. It is evident that the Commission concluded that the attacks were not a complete answer to the testimony of Pope, and that the Commission accepted as a basis for its decision the showing made by Air Southwest through the testimony of Pope.

The fact that testimony is rebutted and contradicted does not destroy it or remove

it from the record. Nor does such conflict cause the testimony to be less substantial, in support of the Commission's decision, if the Commission in the exercise of its discretion believes and accepts the evidence.

A case was made out, in my opinion, to show the need in Texas for an airline commuter service to operate initially connecting the three most populous areas of the State. In several significant phases this proposed service was shown to differ essentially from the services offered by existing airlines and to be a service for which there is a public need and one in the public interest.

The Commission, with the evidence before it found in the record, could find the public interest and need in a service providing (1) flight schedules uniquely flexible to fit the changing needs of a commuting public; (2) transportation of baggage without commingling with the abundance of baggage belonging to passengers traveling to and from other states and to and from Mexico and Canada; (3) speedy, streamlined reservation procedures peculiarly adaptable to commuter service, with one central control for all cities served; (4) greatly simplified ticket handling designed for this type of service; (5) lower fares; and (6) greater reliability for promptness and non-cancellation of scheduled flights.

It was contended by the protesting airlines that the high percentage of delays and cancellations of their flights were accounted for in part by weather conditions and congestion over airports, and that the same adversities would confront Air Southwest. The Commission in considering these factors no doubt recognized that Air Southwest would be delayed by airport congestion at only three sites, all located in Texas, and by weather conditions existing only in this State. The protesting airlines are affected by weather and airport congestion not only in Texas but at all cities and in all states from which their flights are made approaching Texas. Their problems of meeting schedules and avoiding cancellation of flights are multiplied by the number of cities and states they serve in flying to this State.

The Commission had before it substantial evidence that no existing airline would be unduly harmed by the commuter service proposed by Air Southwest. A showing that Air Southwest would provide competition and as a result some of the existing services would suffer some loss in revenues is not a showing of undue harm. All of the protesting airlines affected by the application serve extended areas out of this State as well as within it. The proposed commuter routes would be only partially competitive with these lines. Continental Airlines conceded it would not be unduly harmed. Both Braniff and Trans-Texas were shown to be healthy, growing airlines. Their claims of harmful diversion of revenues if thrown into competition with Air Southwest do not stand up under close scrutiny. The fallacies and discrepancies of these claims are pointed out in detail by the Attorney General and counsel for Air Southwest in their brief. The Commission correctly decided against the claims of undue harm.

The service proposed by Air Southwest and approved by the Commission for inauguration in Texas is more than a mere partial duplication of existing services. As pointed out by the Attorney General, Air Southwest proposes " * * * instead * * * [to] furnish a unique service which is precisely tailored to * * * convenience and necessity" of the people of Texas.

It is my view that the judgment of the district court should be reversed, and that judgment should be rendered by this Court setting aside the trial court's vacation of the order of the Commission and dissolving the injunction by which the Commission was restrained from issuing a certificate.