The TEXAS AERONAUTICS COMMIS-
SION et al., Petitioners,

v.

BRANIFF AIRWAYS, INC. et al.,
Respondents.

No. B–1552.

Supreme Court of Texas.

May 13, 1970.

Rehearing Denied June 17, 1970.

———◆———

Crawford C. Martin, Atty. Gen., Thomas F. Sedberry, Asst. Atty. Gen., Austin, Matthews, Nowlin, MacFarlane & Barrett, Herbert D. Kelleher, San Antonio, Jacobsen & Long, Austin, Gates, Talbot, Morris & Merrell, Los Angeles, Cal., for petitioners.

Clark, West, Keller, Clark & Ginsberg, Dallas, Tex., Herbert Kelleher, San Antonio, McGinnis, Lochridge, Kilgore, Byfield, Hunter & Wilson, James W. Wilson, Clark, Thomas, Harris, Denius & Winters, Donald S. Thomas and Barry Bishop, Austin, for respondents.

REAVLEY, Justice.

The Texas Aeronautics Commission on February 20, 1968, approved the issuance of a certificate of public convenience and necessity authorizing Air Southwest Co. to provide intrastate air service between Dallas/Ft. Worth, Houston and San Antonio. Braniff Airways, Inc., Continental Airlines, Inc., and Trans-Texas Airways, Inc. initiated this action in the Travis County District Court to stop issuance of the certificate by the Commission. Air Southwest intervened on the side of the Commission. Following a seven weeks trial, that court sustained all of the contentions of Braniff et al., set aside the order of the Commission and enjoined it from issuing a certificate to Air Southwest. The court of civil appeals affirmed the judgment of the trial court. 439 S.W.2d 699. The Texas Aeronautics Commission and Air Southwest Co. are petitioners here.

By its application to the Commission, Air Southwest proposes to operate four Lockheed Electra aircraft between the three named airports and, initially, to schedule eight flights per day between Dallas/Ft. Worth and Houston, four flights per day between Houston and San Antonio, and six flights per day between San Antonio and Dallas/Ft. Worth. These flights are to be scheduled on weekdays during the hours between 7 a.m. and 7 p. m., with as many departures as possible between 7 and 9 a.m. and between 4 and 7 p. m. The three routes to be served by Air Southwest are currently served by the following airlines, all holding certificates from the Civil Aeronautics Board acting under the Federal Aviation Act: Dallas/Ft. Worth-Houston by Braniff and Trans-Texas; Dallas/Ft. Worth-San Antonio by American Airlines, Braniff and Trans-Texas; and Houston-San Antonio by American Airlines, Eastern Airlines, Braniff, Continental and Trans-Texas.

■ In all matters of flying safety, such as the air worthiness of the aircraft and the skill of its operators, Air Southwest would be regulated by the Federal Aviation Agency. All Air Southwest aircraft and pilots would have federal certificates. However, by flying only in intrastate commerce and by not interlining with any CAB certificated carrier, making no connection for passengers or baggage, Air Southwest will not require a certificate from the federal agency in charge of economic regulations, the Civil Aeronautics Board. Congress has not pre-empted the field of the economic regulation of air carriers, and the states have the power to act so long as there is no conflict with federal law. 49 U.S.C.A. § 1301(3) and (10), and § 1371; Western Air Lines Inc. v. California, 42 Cal.2d 621, 268 P.2d 723 (1954), cert. denied, 348 U.S. 859, 75 S.Ct. 87, 99 L.Ed. 677; see Island Airlines, Inc. v. C. A. B., 331 F.2d 207 (9th Cir. 1964); Island Airlines, Inc. v. C. A. B., 363 F.2d 120 (9th Cir. 1966); Comment, 47 Texas L. Rev. 275 (1969). A copy of the Air Southwest application was served upon the CAB, as required by the rules of the Texas Aeronautics Commission, but the CAB has taken no part in the matter.

SUBSTANTIAL EVIDENCE REVIEW

█ The Commission has acted under the Authority of Art. 46c–6, sub. 3, Vernon's Anno.Texas Civil Statutes, which has since 1961 provided,[1] in part:

"As to the economic regulations promulgated, the Commission shall take into account the financial responsibility of the carrier, the public convenience and necessity for the proposed service, routes, proposed rates or charges, the effect on existing carriers, and any other factors bearing a relation thereto and pertaining to the public interest and necessity."

The statute further provides that after final determination by the Commission any interested party may appeal to the state court and "shall be entitled to a trial de novo on all facts and circumstances involved in such matter." In accordance with long precedent, the words of the statute are taken to provide for the usual judicial review of administrative orders by which it is the court's responsibility to determine if that order is reasonably supported by substantial evidence. Fire Department of City of Fort Worth v. City of Fort Worth, 147 Tex. 505, 217 S.W.2d 664 (1949).

The CAB carriers (Braniff, Trans-Texas and Continental) contend that the court need only examine the present services afforded by them to these cities and, upon finding those services to be adequate, conclude the case in their favor. They argue that there is no need to look at the effect the proposed service by Air Southwest would have upon passenger traffic or upon the state. The court of civil appeals based its decision on the proposition that it was "bound by the law of *stare decisis* with respect to what the law requires a prospective carrier to prove before it can enter into competition over a given route with presently certified carriers."

The statute governing the regulation of air carriers does not specifically require the Aeronautics Commission to determine that existing services are inadequate prior to the granting of a new certificate. This is the statutory duty of the Railroad Commission prior to its issuance of a certificate for a motor carrier. Art. 911b, § 5a(d), V.A.C.S. From the beginning of the legislative declarations with respect to the licensing of motor carriers, the Railroad Commission has been directed to conserve the highways of the state by not burdening them with more trucks and busses than are necessary. Bailey, Motor Trucks Certificates and Permits in Texas, 20 Texas L.Rev. 165 (1941).

█ Whether named in the statute or not, adequacy of existing service is always an important consideration in determining public need for additional service. *See* Benson v. San Antonio Savings Association, 374 S.W.2d 423, 427 (Tex.Sup.1963). However, in this context "adequacy" should not be taken to denote bare sufficiency. The existing air service, for example, could be inadequate even though anyone with the fare is presently able to obtain passage. If it can be said that the public need does not ordinarily require a new service where existing service is adequate, it can also be said that the public need would ordinarily require that new service which will substantially improve existing service.

█ The decision as to where the public interest lies and what air service is best for Texas must be made by the Texas Aeronautics Commission. The courts may not make this decision for the Commission, nor may we set ourselves to analyze the Air Southwest market projections in order to decide for its investors the profitability of their venture. The Commission has decid-

---

1. This statute was significantly amended by Acts 1969, 61st Leg., p. 1394, ch. 424, § 1, eff. Sept. 1, 1969. The amendment expressly provides: "Nothing in this Act affects any litigation pending on the effective date of this Act."

ed the disputed contentions as to the public interest in favor of Air Southwest; we may interfere with that decision only if there is no reasonable support for it in the judicial record.

After studying this lengthy record with the extensive presentation made by each side, we cannot say that a decision either to grant or deny the application would be unsupported by substantial evidence. We will summarize the reasonable support we find here for the Commission's order.

## POOR PERFORMANCE BY EXISTING CARRIERS

We have the CAB records of the time performance of all flights scheduled on two of these routes in 1967. The record is not a good one.

On the Dallas/Ft. Worth-Houston route in 1967 Braniff canceled 471 flights and arrived late by CAB standard (at least 15 minutes behind schedule) on 2,477 flights. In the same year Trans-Texas canceled 189 flights and arrived late with 844 flights. Of all the flights by these two existing carriers, 27.32% were either late or canceled. In the month of December, 1967, Trans-Texas arrived on time with only 43% of its flights.

On the Dallas/Ft. Worth-San Antonio route Braniff has an effective monopoly. Trans-Texas cannot fly non-stop between these cities. American can do so only as the leg of a flight to Mexico, and it has only one flight each way daily. On this route in 1967 Braniff canceled 202 flights and was late on 1,748 occasions. Of all scheduled flights, 28.26% were either late or canceled.

It is significant that these late arrivals were much more common on the southbound flights than on the northbound flights. Braniff flights from Dallas/Ft. Worth to San Antonio were late on 31.-78% of the trips as compared with 18.45% late flights in the other direction. From Dallas/Ft. Worth to Houston 31.83% of

Braniff flights were late, while only 14.-27% of the northbound Braniff flights were late. The Braniff southbound flights usually originate in distant cities such as Denver, Chicago, Kansas City, or New York and are subject to weather and traffic delays in those areas. Air Southwest insists that it can assure better schedule compliance by being subject only to Texas weather problems and by being free of the problems of other areas. The 1967 performance record of existing carriers supports that contention.

The schedule of existing flights, particularly those flying south from Dallas nonstop to San Antonio, leaves something to be desired. The first daylight flight in the morning leaves Dallas at 8:25 a.m. and the next one is at 11:20 a.m. Only one flight non-stop goes south between 4 p.m. and 7 p.m.

We do not have in this record the information on the arrival performance of the flights between Houston and San Antonio. It does show that available schedules are poor. Though five carriers have authority from the CAB to fly this route, their schedules are made to fit long hauls either to the east or west coast. In 1965 Continental carried 62.47% of the passengers on this route, and Eastern carried another 27.-82%. Braniff and Trans-Texas each had two flights going in each direction at the time of the commission hearing. The CAB carriers point out that they have 37 daily flights on this route. The problem is the timing of those flights to meet the needs of the people commuting between these two cities. For example, between midnight and 7:15 a.m., a person has the choice of six flights from San Antonio to Houston, but if he does not make the Eastern flight No. 50 which leaves at 7:15 a.m. he must wait until the Braniff flight No. 194 departs at 11 a.m.

Braniff and Trans-Texas give the number of empty seats on their flights as proof that existing flights offer more space than the traffic needs. The majority opinion of the court of civil appeals accepts this evi-

dence as forceful proof of the adequacy of existing service. But we should expect empty seats on most airline flights. Air passengers cannot be compared with surface passengers or freight in this respect. To travel by air, one must have a seat which he ordinarily reserves in advance. When a reservation holder cancels or fails to show, there is usually no one there to take the seat. The significant statistic is the load factor, or percentage of occupied seats, rather than the total of empty seats.

We are not given the load factors for all flights throughout the year of 1967. Trans-Texas gives us no load factors. Both Trans-Texas and Braniff only give us figures for one month, that of January, 1968. January is admittedly a poor month for air travel. All flights are lumped together so that we cannot tell the experience during peak traffic hours. Braniff had an average 54.1% load factor between Dallas/Ft. Worth and Houston and an average 61% load factor between Dallas/Ft. Worth and San Antonio during January 1968. This average includes all flights, at any hour and on every day of the week.

Though these January load factors were picked by the CAB carriers for purposes of their argument, the percentages are not so low as to give force to that argument. Seventy percent is considered a high load factor by air carriers, and when all flights are considered no airline in the nation shows so high a factor.

Four out of the seven public witnesses testifying for Air Southwest expressed strong dissatisfaction with the ground service of the CAB carriers. They complained that baggage did not arrive, that reservations required too much time to obtain, and that the procedure at the check-in counters was consistently slow and tedious. When they desired only to take a flight on one of these routes, they were required to stand in line and wait for long periods while some person in front of them planned a complicated itinerary with con-

necting flights and while elaborate information was written on the CAB ticket form for each person in the line.

## ADMISSIBILITY OF SURVEY OF PUBLIC ATTITUDE

Air Southwest offered in evidence the results of a poll or survey of the "Attitudes of travelers toward Air Southwest's proposed service," which was taken in October of 1967. We disagree with the trial court's ruling that the survey results were inadmissible. Mr. Walter Bowles, who had directed the survey, testified as to its planning and results. Mr. Bowles has some twenty years of experience in this field and has supervised more than 2,000 surveys of public opinion. Since he testified about this survey at the hearing before the Texas Aeronautics Commission, and there presented his work papers, the CAB carriers had full opportunity to investigate and develop any particular objections they might have as to the methodology and execution of the poll. Three of the interviewers employed by Mr. Bowles were presented to testify in the trial court, and the opponents could have obtained testimony from other interviewers had it been significant to them.

Insofar as the poll tested the attitude of satisfaction or dissatisfaction with existing air travel service in these markets, the evidence is admissible whether it is considered to be nonhearsay or within the state of mind exception of the hearsay rule. *See*, generally: Zeisel, The Uniqueness of Survey Evidence, 45 Cornell L.Q. 322 (1960); Note, 66 Harvard L.Rev. 498 (1953); Anno: Admissibility and weight of surveys or polls or consumer's opinion, recognition, preference, or the like, 76 A. L.R.2d 619 (1961). The more the question and answer move into the realm of opinion or risk the hearsay dangers, the less acceptable they become as evidence. Five hundred air travelers were questioned at airports at the three cities which Air Southwest seeks to serve. They were asked to rate existing airline service as ei-

ther "excellent," "good" or "not so good." Taken literally, this may be considered entirely objectionable as eliciting only opinion of the interviewees, but the response may also be construed as no more than personal attitude towards existing service.

When Air Southwest had completed its offer of proof or "bill of exception" in connection with this survey, the attorney for Trans-Texas sought to cross-examine Mr. Bowles and to refute Air Southwest's contentions as to the weight to be given the survey in the event the appellate court disagreed, as we do, with the trial court's ruling as to its admissibility. The trial court would not permit this and proceeded as if it were the usual type of trial where fact issues are determined at that stage and as though the case would be remanded for new trial in the event of a different holding on the admissibility of evidence. Since substantial evidence review presents only a question of law, and the issues are not constricted by an appeal, the trial court should have allowed rebuttal proof in this instance in order to avoid that possibility of retrial.

The denial of this effort to cross-examine and to undermine the weight of the survey prevents us from considering it as support for the Commission's order. Since we find sufficient support elsewhere in the record, there is no need for further development of the evidence as to the survey.

## THE AIR SOUTHWEST PROPOSAL

We now turn to the present means and proposed operations of the applicant. The record shows that Air Southwest has made careful plans for its operations, and its financial responsibility cannot be disputed. An agreement was reached with American Airlines for the purchase of the Electra aircraft and for payment over a period of five years. Arrangements were made for their maintenance by American Flyers Airlines of Ardmore, Oklahoma. Officials of Allstate Insurance Company testified as to their willingness to pay $3,000,000 for pre-

ferred stock. An additional $2,000,000 has been obtained by private stock sales or will be obtained according to subscriptions in hand.

Air Southwest will offer a type of service to travelers between these cities which the Commission could well have decided would present considerable appeal. The Air Southwest flights will be scheduled and designed only for non-stop passage from one of these Texas cities to another. Air Southwest will not arrange for reservations on connecting flights; it will only fly the single stage. While this may remove Air Southwest from competition for the passenger traveling further, it will enjoy advantages for the commuter by simplification of reservations, ticketing, baggage handling and boarding.

Any baggage on board when the plane lands will be taken off, and there will be no chance of it being carried to or removed at the wrong airport. Since no reservations or ticketing will be required for anything except the one stage, these procedures will be considerably simplified and the passenger may pay his fare and go on board without waiting. Better schedule performance is promised because the weather and traffic congestion of New York, Chicago or Denver will not affect Air Southwest's operations as they do the flights of CAB carriers having to come from those cities. All of the above should cut down on the total trip time of the traveler.

Air Southwest's fares will be substantially lower than that of the CAB carriers: The Dallas/Ft. Worth-Houston Air Southwest fare will be $14.95 as compared with the competition's $19.00; Dallas/Ft. Worth-San Antonio fare will also be $14.95 compared with $19.00; San Antonio-Houston Air Southwest fare will be $12.95 as compared with the competition's $17.00.

Additional flights will be provided in all of these markets at the times most needed by the public.

Charles W. Pope, Sr. of San Antonio and Alan G. Kenison and James E. Thompson of California, all expert witnesses for Air Southwest, testified as to the successful experience of similar service by Pacific Southwest Airlines and Air California, flying between San Francisco and Los Angeles. Whereas the size of the market there may not be comparable to these in Texas, it is significant that the carrier in that market providing this limited stage flight without interstate connections or CAB regulation, and at a lower fare, has so attracted the public as to become prominent if not dominant in the market served. CAB statistics and the three expert witnesses prove this to be the fact.

Since the record reasonably supports the order of the Texas Aeronautics Commission of February 20, 1968, it is entitled to be given full effect. The judgments of the trial court and court of civil appeals are reversed; judgment is here rendered denying the injunction and all relief sought by respondents.