The CITY OF DALLAS, TEXAS et al.,
Plaintiffs,

v.

SOUTHWEST AIRLINES COMPANY,
Defendant,

Texas Aeronautics Commission,
Intervenor Defendant.

No. CA 3-5927-C.

United States District Court,
N. D. Texas,
Dallas Division.

June 21, 1973.

---

32. About $140,000 has been expended in preparing the final EIS.

N. Alex Bickley, City Atty., Dallas, Tex., for Dallas.

S. G. Johndroe, Jr., City Atty., Fort Worth, Tex., for Fort Worth.

Lee E. Holt, Asst. City Atty. (Leg. counsel by assignment), Arlington, Tex., for Board.

John L. Hauer, Robert E. Goodfriend, Michael Caolo, Jr., Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., and Herbert D. Kelleher, John T Behrendt, Oppenheimer, Rosenberg, Kelleher & Wheatley, Inc., San Antonio, Tex., for Southwest.

John L. Hill, Atty. Gen. of Tex., Rex H. White, Jr., Asst. Atty. Gen., Austin, Tex., for Texas Aeronautics.

MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

This case involves the right of access of Southwest Airlines Co. (hereinafter

sometimes referred to as "Southwest") to Love Field, a public airport owned and operated by the City of Dallas, Texas. Plaintiffs, the City of Dallas, the City of Fort Worth, and the Dallas-Fort Worth Regional Airport Board, seek a declaratory judgment, pursuant to 28 U.S.C. Sec. 2201, declaring their right under federal and state law to exclude Southwest, a purely intrastate air carrier, from Love Field on and after the opening of the new Dallas-Fort Worth Regional Airport. The Regional Airport, which is scheduled to open in the fall of 1973, is a joint undertaking by the Cities of Dallas and Fort Worth, each of which presently owns and operates its own airports. Plaintiff, the Regional Airport Board, is an administrative body, created by contract and agreement between the cities, to which the cities have delegated certain operating powers over the Regional Airport. In conjunction with their joint effort on the Regional Airport, the Cities of Dallas and Fort Worth have covenanted to phase-out all Certificated Air Carrier Services (as defined in their 1968 Concurrent Bond Ordinance) at their respective wholly owned airports, including Love Field, to the extent that they may legally do so, and to transfer such services to the new Regional Airport upon its completion.

Defendant, Southwest, has answered and counterclaimed against the Cities and the Regional Airport Board seeking, pursuant to 28 U.S.C., Sec. 2201 and Sec. 2202, a declaration of its right under federal and state law to remain at Love Field and an injunction to protect that right. The Texas Aeronautics Commission (hereinafter sometimes referred to as the "TAC"), the state agency charged with the economic regulation of intrastate air carriers, has intervened as a Defendant in this case, adopting the contentions of Southwest Airlines and specifically urging that the attempted ouster of Southwest from Love Field usurps the TAC's exclusive regulatory power over intrastate air carriers; is invalid under state law; and is contrary to, and beyond the scope of, the powers delegated to Texas Home Rule cities by the State of Texas.

Jurisdiction in this case is founded on the existence of a Federal question and the amount in controversy, 28 U.S.C., Sec. 1331; on an act of Congress regulating commerce, 28 U.S.C. Sec. 1337; on 28 U.S.C., Sec. 1343(3) and (4); and on the pendent jurisdiction of the Court. The Federal causes of action arise under the Federal Aviation Act of 1958, 49 U.S.C., Sec. 1301 et seq.; the Civil Aeronautics Act of 1938, 49 U.S.C., Sec. 401 et seq.; the Airport and Airways Development Act of 1970, 49 U.S.C., Sec. 1701, et seq.; the Federal Airport Act, 49 U.S.C., Sec. 1101, et seq.; 42 U.S.C., Sec. 1983 and Sec. 1985(3); and the Fifth and Fourteenth Amendments to the United States Constitution. The state causes of action are based on the Texas Aeronautics Act, Art. 46c–1 et seq., Vernon's Ann.Civ.St.; on the Municipal Airports Act, Art. 46d–1 et seq., V.A.C.S.; and on the Texas Constitution. The state causes of action are based on a common nucleus of operative fact with the Federal causes of action.

For many years the Cities of Dallas and Fort Worth were engaged in a fierce, intense and sometimes bitter rivalry for the business of commercial aviation and commercial air carriers. Dallas enlarged and improved its Love Field, which is approximately five to six miles north-northwest of the downtown business district of the City and Fort Worth, rather than undertaking the enlarging and improving of its inadequate Meacham Field, which is approximately five to six miles north of downtown Fort Worth, constructed a fine large airport, now known as Greater Southwest International Airport (GSIA), midway between the two cities. The downtown business districts of Dallas and Fort Worth are about 31 miles apart, and the two cities with the passage of time have grown, extended their limits, and in some places are almost contiguous. Only 12 miles separate Love Field and GSIA. Serving two airports which

were so close together resulted in unnecessary expense to the carriers as well as the taxpayers and inadequate and incomplete air service to both cities. Happily, the two cities have now joined hands and are well on the way to the construction of what promises to be the finest airport in the world. The two cities joined together in the bringing of this lawsuit. This congenial alliance was not exactly the result of a shotgun wedding but more than a gentle nudge was provided by the Federal Government's Civil Aeronautics Board, hereinafter sometimes referred to as CAB, which in August of 1962 instituted an investigation known as the Dallas-Fort Worth, Texas Regional Airport Investigation, Docket No. 13959, for the purpose of determining whether or not the certificates of public convenience and necessity of interstate airlines under the CAB's jurisdiction should be amended so as to designate a specific airport as the single point through which all interstate air carrier service to Dallas and Fort Worth must be provided. Finally, after many hearings, the CAB in 1964 entered an interim order giving the two cities a period of 180 days in which to arrive at a voluntary agreement to designate the single airport through which the CAB-regulated carriers would serve the Dallas-Fort Worth area. It indicated that if the parties were unable to agree on the designation of the airport to serve the area, it would then proceed to issue a final determination and amend the certificates of the interstate "air carriers" under its jurisdiction so as to cause them to serve either Love Field or Fort Worth's GSIA. The CAB has entered no further orders in the investigation and none of the certificates of the carriers under CAB jurisdiction have been amended.

Rather than designating an existing municipal airport to serve the Dallas-Fort Worth area, the cities agreed to construct and operate a new regional airport to be located approximately midway between Dallas and Fort Worth at Grapevine, Texas. Thereafter, on November 11 and 12, 1968, the cities jointly adopted the 1968 Regional Airport Concurrent Bond Ordinance authorizing the issuance of Dallas-Fort Worth Regional Airport Joint Revenue Bonds for the financing of the new airport. The 1968 Ordinance provides, among other things, that the cities:

"... shall take such steps as may be necessary, appropriate and legally permissible (without violating presently outstanding legal commitments or covenants prohibiting such action), to provide for the orderly, efficient and effective phase-out at Love Field, Redbird, GSIA and Meacham Field, of any and all Certificated Air Carrier Services, and to transfer such activities to the Regional Airport effective upon the beginning of operations at the Regional Airport." Section 9.5.

The Ordinance also provides, in Section 9.5, for a waiver of the phase-out provision if eight (8) members of the eleven (11) member Regional Airport Board determine that a waiver is necessary "(1) in the interest of the public safety; (2) in the interest of prudent and efficient operations at the Regional Airport; or (3) in the interest of satisfying an overriding public need for decentralized Certificated Air Carrier Services in the Dallas-Fort Worth metropolitan region considered as a whole." In addition, the Ordinance specifies that if the grant of a waiver by the Regional Airport Board results in a reduction in Regional Airport revenues, the city benefiting from the waiver must pledge to transfer back to the Regional Airport such amount as will justly compensate such Airport for its loss of revenue.

In early 1970, in order to insure that sufficient revenues would be available to maintain and operate the Regional Airport and to meet all debt service requirements on the Airport Revenue Bonds, the Regional Airport Board executed Letters of Agreement with the eight (8) CAB certificated air carriers then serving the Dallas-Fort Worth

area.[1] These letter agreements provide that each signatory airline will " . . . move all of its Certificated Air Carrier Services serving the Dallas-Fort Worth area to the Airport . . . to the extent required under the terms of the 1968 Regional Airport Concurrent Bond Ordinance." Each of the CAB carriers also contracts "to pay rentals, fees and charges for its use, operations and occupancy of the Airport premises and facilities and the services appertaining thereto in an amount which, together with the rentals, fees and charges paid by other Airlines and others using the Airport premises and facilities, will be sufficient to produce total gross revenues required to satisfy the Airport Board's obligation . . ." to collect each year monies sufficient to maintain and operate the Airport, plus 1.25 times the debt service requirements on the Regional Airport revenue bonds, and plus an amount equal to any other obligations required to be paid from the revenues of the Airport.

On June 18, 1971, after some three and one-half years of hearings, litigation, and appeals occasioned by competitive CAB certificated air carriers, Defendant Southwest Airlines Co. commenced its purely intrastate operations, as a "commuter airline," between Love Field, Dallas, and Houston and San Antonio, pursuant to Certificate of Public Convenience and Necessity No. 22 issued by the Texas Aeronautics Commission (TAC). Southwest's Certificate stated that it was authorized to serve the Dallas-Fort Worth region through "any" airport in the area. On November 12, 1971, however, the TAC issued a general order and regulation, styled "Minute Order No. 22," which directed all TAC certificated airlines not to change the airports from which they were then conducting their intrastate services unless they first obtained written approval from the TAC to do so. On and before November 12, 1971, Southwest was oper-

ating from Love Field, as it continues to do today.

On October 20, 1971, Southwest Airlines formally advised the Regional Airport Board that it intended to stay at Love Field when the eight (8) CAB certificated airlines moved their operations from Love Field to the Regional Airport. Southwest also withdrew from its brief participation in planning sessions regarding the transfer of services from Love Field to the Regional Airport, and declined to execute the letter agreement with the Airport Board that had previously been signed by the CAB carriers.

On March 6, 1972, Southwest Airlines filed with the Regional Airport Board an instrument called a "Petition for Exemption, or Alternatively, Application For Waiver," by which it sought a determination from the Airport Board that Southwest was not required by the 1968 Concurrent Bond Ordinance, and could not lawfully be required, to move to the Regional Airport, or, alternatively, that a waiver of the transfer requirement should be granted under Section 9.5(A) of the Ordinance on the basis of an "overriding public need." After holding this Petition for three months without acting upon it, the Airport Board decided, on June 6, 1972, that the CAB rulings in the Dallas-Fort Worth Regional Airport Investigation deprived the Airport Board of jurisdiction to consider and act upon Southwest's Petition. That same day the two Cities and the Airport Board filed their Complaint against Southwest, commencing this lawsuit.

Among other contentions Plaintiffs argued in their Complaint that they were required by the rulings of the Civil Aeronautics Board in the Dallas-Fort Worth Regional Airport Investigation to transfer all certificated air carrier services to the new Regional Airport, including the intrastate services of Southwest Airlines. While Plaintiffs

---

1. These air carriers are American Airlines, Inc.; Braniff Airways, Incorporated; Continental Airlines, Inc.; Delta Air Lines, Inc.; Eastern Air Lines Incorporated; Frontier Airlines, Inc.; Ozark Air Lines, Inc.; and Texas International Airlines, Inc.

seem to have abandoned this position in their closing arguments and brief, the Court, nevertheless, finds their contention in this regard without merit because, among other reasons: (1) the Civil Aeronautics Board has no jurisdiction over a purely intrastate airline such as Southwest; (2) it never attempted to assert any such jurisdiction in its interlocutory orders entered in the Regional Airport Investigation; (3) it has jurisdiction only over "air carriers" engaged in "interstate air transportation"; and (4) it has no jurisdiction over cities or their airports, as such.

■■■ Pursuant to the Federal Aviation Act of 1958, the Civil Aeronautics Board is authorized to exercise regulatory jurisdiction *only* over air carriers engaged in "interstate air transportation" as that term is defined in the Act.[2] Western Air Lines, Inc. v. California, 42 Cal.2d 621, 268 P.2d 723 (1954), appeal dismissed, 348 U.S. 859, 75 S.Ct. 87, 99 L.Ed. 677. Because Southwest does not engage in, and is not authorized to engage in, "interstate air transportation,"

the CAB itself has held that it has no jurisdiction over Southwest Airlines (then known as "Air Southwest Co."). See CAB Orders 71–6–79 and 71–9–23 (1971), in Texas International Airlines, Inc. v. Air Southwest Co., Docket 23047, and Braniff Airways, Inc. v. Air Southwest Co., Docket 23122. The CAB's position that it lacks jurisdiction over Southwest has been repeatedly upheld by the Courts. Texas International Airlines, Inc. v. CAB, 154 U.S.App.D.C. ·113, 473 F.2d 1150, 1152 (1972); Braniff Airways, Inc. v. CAB, *ibid;* Texas Aeronautics Commission v. Braniff Airways, Inc., 454 S.W.2d 199, 200 (Tex. Sup.1970), cert. denied, 400 U.S. 943, 91 S.Ct. 244, 27 L.Ed.2d 247 (1970). Under the law, no orders or rulings by the Civil Aeronautics Board in the Dallas-Fort Worth, Texas, Regional Airport Investigation could be binding on, or in any way applicable to, Southwest Airlines. Furthermore, there is nothing in the language of the CAB orders which would indicate that any of them were directed to intrastate airlines such as Southwest.[3]

**2.** The Federal Aviation Act defines "interstate air transportation" as "the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce between, respectively—

"(a) a place in any State of the United States . . . and a place in any other State of the United States . . .; or between places in the same State of the United States through the airspace over any place outside thereof . . ." 49 U.S.C. Sec. 1301(21).

Southwest Airlines does not carry any mail. It does not fly between Texas and any other State. It does not fly through any airspace outside of the State of Texas.

**3.** As used in the CAB Orders, "air carrier" is a term of art and not of general description. It is defined in 49 U.S.C. Sec. 1301(3) to mean "any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in *air transportation* . . . ." (emphasis added).

"*Air transportation*," in turn, is defined as "*interstate,* overseas, or foreign air transportation or the transportation of mail by aircraft." 49 U.S.C. Sec. 1301(10) (empha-

sis added). The Court finds no indication that the CAB in its Orders intended to apply the term "air carriers" to purely intrastate airlines, i. e., in a manner at variance with the definition of that term in the Federal Aviation Act.

Defendant Southwest has also contended, in answer to Plaintiffs' argument of federal compulsion arising from the CAB Orders in the Dallas-Fort Worth Regional Airport Investigation, that such Orders are non-coercive, speaking only in terms of a "voluntary agreement" between the Cities; that the CAB's power to designate a single airport for the Dallas-Fort Worth area derives not from any CAB power over the Cities of Dallas and Fort Worth, but solely from the CAB's power to amend the certificates of public convenience and necessity of the CAB carriers, which certificates remain unamended to this date; and, finally, that Plaintiffs themselves admit in their Complaint that "no order terminating the investigation has ever been entered and the entire proceeding remains open to this date, and under the continuing jurisdiction of the Civil Aeronautics Board." Southwest argues that, under these circumstances, the CAB has not yet actually ordered any airline, interstate or intrastate, to leave Love Field, and, conse-

Plaintiffs' next argument rests on the premise that the CAB has ordered all CAB "air carriers" to move to the Regional Airport, and that, since Love Field and the Regional Airport have both received federal funds pursuant to federal airport aid programs, the Plaintiffs are required to exclude Southwest from Love Field in order to avoid unjustly discriminating against the CAB carriers in violation of 49 U.S.C. Secs. 1110 and 1718.[4] This argument misconceives the function, purpose, and application of the federal anti-discrimination statutes.

The federal prohibition against unjust discrimination is designed to insure that the *airport owner or operator* (referred to as the "sponsor" in both the statutes and the grant agreements) provides potential users of the airport with a fair and nondiscriminatory "opportunity" to use its facilities, provided the user can lawfully do so. If the potential user cannot, or does not, choose to avail itself of the "opportunity" to use the airport, the airport operator is obviously not required to exclude those who can and do choose to use such facilities. Therefore, even if the Plaintiffs were correct in arguing that the CAB has excluded the interstate carriers from Love Field, there would still be no merit to their contention that, consequently, they must eject Southwest Airlines. The forbidden discrimination can occur only as between parties that are legally able to serve Love Field and are desirous of so doing. To hold otherwise would lead to exceedingly incongruous results.

Suppose, for example, the reverse situation existed and a state regulatory agency had ordered an airline under its jurisdiction to cease operations at a particular airport. Under Plaintiffs' view of the law, the airport owner would then be required by federal law to exclude all CAB carriers who remained there. Similarly, suppose the CAB ordered some carriers under its jurisdiction to leave Love Field, but not others. Under Plaintiffs' argument, the airport operator would then have to exclude the remaining carriers in order not to discriminate against those that had been ordered to leave. Presumably, the same line of reasoning would apply to voluntary abandonments by airport users. Obviously, the Congress did not intend

---

quently, that there is no substance to Plaintiffs' argument that they are seeking to exclude Southwest pursuant to CAB Orders. Southwest has also pointed out that it has never been accorded either notice or hearing with respect to the Regional Airport Investigation, and that, consequently, any application to Southwest of Orders emanating from that Investigation would be in direct violation of the Federal Aviation Act, 49 U.S.C. Sec. 1371(g), as construed in American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App.D.C. 310, 359 F.2d 624 (1966), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75; the Administrative Procedure Act, 5 U.S.C. Secs. 554 and 556; and the Fifth and Fourteenth Amendments to the United States Constitution, see Civil Aeronautics Board v. Delta Air Lines, Inc., 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961). Although the Court is of the opinion that each of these contentions is valid, it does not deem it necessary to discuss them extensively in light of its conclusion that the CAB Orders were not directed to purely intrastate airlines and its further conclusion that the CAB lacks jurisdiction over Southwest.

4. The Federal Airport Act, 49 U.S.C. Sec. 1110, provided in pertinent part:

"The Administrator shall receive assurances in writing, satisfactory to him, that

—

"(1) the airport to which the project relates will be available for public use on fair and reasonable terms and without unjust discrimination."

This provision was subsequently transferred to, and now appears in, the Airport and Airway Development Act of 1970, 49 U.S.C. Sec. 1718, which provides:

"As a condition precedent to his approval of an airport development project under this subchapter, the Secretary shall receive assurances in writing, satisfactory to him, that—

"(1) the airport to which the project for airport development relates will be available for public use on fair and reasonable terms and without unjust discrimination;"

As discussed more fully hereafter, Dallas has received federal aid pursuant to both statutes.

so bizarre an interpretation of its anti-discrimination statutes. The Court concludes that the removal of Southwest Airlines is not required by any prohibition against unjust discrimination.

■ The Plaintiffs have similarly contended that allowing Southwest to use Love Field, after the opening of the Regional Airport, would violate 49 U.S.C. Sec. 1349(a), which provides:

"There shall be no exclusive right for the use of any landing area or air navigation facility upon which federal funds have been expended."

In interpreting this Statute, the Federal Aviation Administration has pointedly observed:

"The presence on an airport of one person engaged in an aeronautical activity as herein defined will not itself be considered a violation of this policy if there is no intent by express agreement, imposition of unreasonable standards or requirements, or by any other means to exclude others. This would occur when the volume of business may not be sufficient to attract more than one person. *As long as the opportunity to engage in an aeronautical activity is available to those meeting reasonable qualifications and standards relevant to such activity, the fact that only one person takes advantage of the opportunity does not constitute the grant of an exclusive right.*" (emphasis added) 30 F.R. 13, 661.

The Plaintiffs have again attempted to use a statute to justify conduct which that statute expressly prohibits. If the CAB carriers are precluded from serving Love Field after the opening of the Regional Airport, such preclusion results from action by the CAB, which has no jurisdiction over Southwest, or from the voluntary Letter Agreements between the Plaintiffs and the CAB carriers. The CAB carriers have not been excluded from Love Field by the *Plaintiffs*, and, therefore, Southwest's presence at Love Field after the opening of the Regional Airport can in no way be considered the prohibited grant of an exclusive right. Southwest has not voluntarily relinquished its right to serve Love Field and that right has not been limited or restricted by any regulatory agency with authority over Southwest.

■ Plaintiffs next argue that the Regional Airport is part of the National Airport System Plan and is "totally consistent with" the Airport and Airway Development Act of 1970, 49 U.S.C. Sec. 1701 et seq. Plaintiffs appear to argue that since they have received $60,848,031.27 in federal funds from the Federal Aviation Administration for the Regional Airport, and the Secretary of Transportation has acted jointly with the Cities of Dallas and Fort Worth in planning the Regional Airport, the actions of the two Cities are somehow rendered immune from, or supreme to, the law.

The Court notes preliminarily that the Airport and Airway Development Act was passed by Congress in 1970, five years after the Plaintiffs had received FAA Commitments for the Regional Airport Project and two years after the enactment of the 1968 Ordinance which required the termination of Certificated Air Carrier Services at Love Field upon the opening of the Regional Airport. Whether or not Plaintiffs' actions herein are "consistent" with this subsequent federal legislation is immaterial. The important consideration, and the one which is fatal to Plaintiffs' contention in any and all events, is that the Airport and Airway Development Act could not have authorized the phase-out provision of the 1968 Ordinance. That Act, while containing a prohibition against unjust discrimination by airport owners receiving federal funds, see 49 U.S.C. Sec. 1718, and while establishing a mechanism for the disbursement of such funds, does not confer upon either the Federal Aviation Administration or the Plaintiffs herein any economic regulatory power over air carriers. The purpose of the Act is to promote the planning and construction of airports, not to confer upon cities the power to decide the

routes of air carriers, which involves determinations of public convenience and necessity.[5] It should also be mentioned that the only funds allotted to the Cities of Dallas and Fort Worth under this Act have been allocated to the Regional Airport and not to Love Field. Plaintiffs have not shown that the FAA has taken any action under the Act with respect to Love Field.

Finally, Plaintiffs apparently contend that if Southwest Airlines is permitted to remain at Love Field after the opening of the Regional Airport, the ability of the Regional Airport Board to operate that Airport and to retire the outstanding debt on the Airport Revenue Bonds will be jeopardized due to diversion of needed revenue to Love Field. It is not seriously argued by Plaintiffs that the revenues from Southwest Airlines' three present aircraft and the passengers they carry are, in and of themselves, essential to the operation of the Regional Airport. Instead, Plaintiffs maintain that Southwest's continued presence at Love Field will, to some extent, induce the CAB carriers to retain service there (an argument that Southwest has characterized as the "domino theory") and that the cumulative loss of revenue from Southwest *and* these other carriers will have a significant impact on the financial security of the Regional Airport.

In the opinion of the Court, the following evidence, among other items, demonstrates that Plaintiffs have overstated their fears concerning the financial impact upon the Regional Airport of Southwest's remaining at Love Field:

1. The eight (8) CAB carriers executing the Letter Agreements have agreed to pay any deficit resulting from the operation of the Regional Airport, including 1.25 times the annual debt service on the Regional Airport Revenue Bonds. Plaintiffs' Exhibits purporting to show diversion of funds from the Regional Airport to Love Field in fact show that the Regional Airport receives the same amount of revenues annually whether Southwest Airlines is there or at Love Field. Any diversion which occurs constitutes, at most, an added cost to the CAB carriers. It does not penalize the Regional Airport Board or the citizens of Dallas and Fort Worth.

2. The outstanding Love Field "Senior Lien Bonds" are a first lien upon Regional Airport revenues and must be paid even before the Regional Airport Revenue Bonds themselves. Thus, any revenue generated at Love Field by Southwest Airlines defrays the costs and expenses of the Regional Airport, if the income from Love Field is insufficient to pay *its* maintenance and operating expenses and debt service.

3. The Plaintiffs' "diversion" exhibits were basically predicated upon the assumption that *all* Dallas/Fort Worth intrastate air service would be provided through Love Field if Southwest Airlines remained there. It was forceably demonstrated by Defendants that this assumption was erroneous and that the "diversion" figures in question were therefore overestimated. Plaintiffs' own conduct and opinions confirm this. First Southwest Company, an invest-

5. Nothing herein is intended to imply that the FAA may not exclude particular aircraft from an airport pursuant to its power to regulate safety in civil aeronautics; see Subchapter VI of the Federal Aviation Act of 1958, 49 U.S.C. Secs. 1421–1430. However, as testified to by Mr. Henry Newman, the Regional Administrator of the FAA, there are no safety considerations which require the exclusion of Southwest Airlines from Love Field at this time and there are no foreseeable safety problems at Love Field after the opening of the Regional Airport.

Therefore, the Court concludes that matters of safety are not involved in this case.

Mr. Newman also sponsored an Environmental Impact Statement which pertained to the Regional Airport, rather than to Love Field, and which was adopted five years after the FAA had committed funds to the Regional Airport. The relationship of this Statement to Southwest's right to remain at Love Field was never explained or pressed by Plaintiffs, and no environmental issues relevant or material to this matter were ever raised by Plaintiffs.

ment banking firm under contract to the Regional Airport Board as its financial advisor, gave its written opinion on March 10, 1972, that Southwest Airlines' refusal to go to the new airport was not a fact of any material financial significance to the $112 million in revenue bonds issued on March 29 of that year, and Thomas Sullivan, the Executive Director of the Regional Airport Board, concurred in that judgment in a written opinion of March 16, 1972, pointing out that the new airport had never included any projected revenues from Southwest Airlines in its own revenue projections. Similar statements of lack of "materiality" were made in the Official Statements pertaining to bonds issued significant to the institution of this lawsuit and were concurred in by Mr. Decker Jackson of First Southwest Company during his testimony.

Although not pleaded by Plaintiffs, this Court is not indifferent to the financial needs of the Regional Airport. However, the evidence which Plaintiffs have presented on this point is at best inconclusive, and its relevance to the fundamental legal issues in this case has never been explained. Financial necessity can neither legitimize an unjust discrimination nor augment the basic powers of municipalities as granted to them by the State. Plaintiffs have wholly failed to establish that Southwest Airlines is required by law to remove its operations to the Regional Airport upon its opening. The Court now turns its attention to the question of whether the Plaintiffs may directly or indirectly exclude Southwest from Love Field when the Regional Airport opens.

■ It is the conclusion of this Court that none of the Plaintiffs have the power to deny Southwest access to Love Field for any aspect of its operations. It is likewise beyond the power of Plaintiffs, or any of them, to require Southwest to provide any services through the Regional Airport upon its

opening. The bases for this conclusion are numerous, but their number should not detract from the fact that each ground is, in and of itself, sufficient to preclude Plaintiffs from denying Southwest access to Love Field.

■ Love Field is *public* facility and installation. There is no dispute among the parties to this case that Love Field has over the years been the recipient of federal funds, property and land through various federal aid programs, and that it is subject to federal prohibitions against unjust discrimination and the grant of an exclusive right.[6] In the early 1940's, Love Field was the recipient of federal funds through WPA grants. During World War II, the United States Government enlarged the field, improved the runways, and established various facilities there. Following the War, in 1949 and again in 1955, the United States conveyed equipment, buildings and land to Love Field pursuant to the Surplus Property Act, and in 1950 and 1951 (and by subsequent amendments), grants in aid of approximately $429,603.95 were made to Love Field pursuant to grant agreements between the City of Dallas and the Civil Aeronautics Administration acting under the Federal Airport Act. In addition, the Federal Aviation Administration has spent in excess of $29,000,000 for its general operations at Love Field and for navigational aids. Finally, as previously noted, the Regional Airport has received, since 1966, in excess of $60,000,000 in federal aid pursuant to the Federal Airport Act and the Airport and Airway Development Act of 1970. In accordance with present FAA policy, the receipt of such aid subjects *all* airports under the operation and ownership of the recipients thereof to the aforementioned statutory prohibitions. See 30 F.R. 13, 661 and grant agreements to the Regional Airport. Since both Dallas and Fort Worth are recipients of federal funds through the

6. See 49 U.S.C. Secs. 1110(1) and 1718(1); 50 App. Sec. 1622(g); and 49 U.S.C. Sec. 1349 (a).

grants-in-aid to the Regional Airport, all of their municipal airports are subject to federal restrictions.

In order to properly assess Southwest's argument that its exclusion from Love Field will violate federal law, it is necessary to examine Plaintiffs' present plans for the use of Love Field after the Regional Airport becomes operational.

As discussed above, the 1968 Concurrent Bond Ordinance provides for the phase-out of all "Certificated Air Carrier Services" from Love Field after the opening of the Regional Airport. The term "Certificated Air Carrier Services" is defined in Section 2.1G of the Ordinance as follows:

"G. 'CERTIFICATED AIR CARRIER SERVICES' mean aircraft operations of the following types when operating on a regular and continuing basis, to wit:

(1) interstate services conducted by commercial air carriers according to published flight schedules and holding certificates of public convenience and necessity or similar evidences of authority issued by the Civil Aeronautics Board of the United States of America or any successor agency thereto;

(2) services conducted by foreign air carriers according to published flight schedules holding permits or similar evidences of authority issued by the Civil Aeronautics Board or any successor agency thereto or by any other agency or department of the United States of America; and

(3) intrastate services conducted by commercial air carriers according to published flight schedules and holding certificates of public convenience and necessity or similar evidences of authority issued by the Texas Aeronautics Commission of the State of Texas or by any successor agency.

It is provided, however, that this term shall not include services provided by commercial 'air taxi' operators meeting the requirements for exemption provided from time to time by any rules and regulations of the Civil Aeronautics Board, by the Texas Aeronautics Commission or by any other agency of the United States of America or the State of Texas having jurisdiction to provide such exemptions."

It should be noted that subsection (3) of the definition of "Certificated Air Carrier Services" clearly includes Defendant herein, Southwest Airlines Co. However, "air taxi" operators are expressly excluded from the definition, and therefore not subject to the phase-out requirement, despite the fact that such operators carry passengers for hire on a scheduled basis; are certificated by the TAC with respect to their intrastate services; and are competitors of Southwest Airlines. Moreover, the phase-out requirement is also inapplicable to all unscheduled charter flights, even when conducted by CAB certificated air carriers; to general aviation (i. e., private and corporate aircraft); and to unscheduled cargo flights, all of which fall outside the definition of "Certificated Air Carrier Services." The purely intrastate services of the eight CAB carriers presently operating at Love Field are likewise outside the scope of the Ordinance, inasmuch as the only intrastate services covered by the Ordinance are those certificated by the TAC and the intrastate services of the CAB carriers are not so covered. Thus, with respect to intrastate air services, the 1968 Concurrent Bond Ordinance is applicable *only* to Southwest, since, except for the specifically exempted air taxis, Southwest Airlines provides the only TAC certificated intrastate air service to Love Field.

Plaintiffs contend that after the opening of the new Regional Airport, Love Field will become a general aviation facility due to the exclusion of all scheduled commercial operations, and that the classification scheme that has been adopted to accomplish this end is a reasonable one. The Court must disagree.

In the first place, Plaintiffs have not excluded all scheduled commercial opera-

tions from Love Field, but have expressly exempted air taxi operators from the phase-out requirement of the Ordinance. Whether the air taxi operators actually choose to remain at Love Field is not important; the controlling consideration is that under the Ordinance they are eligible to do so.

Moreover, the purely intrastate operations of the CAB carriers are also not included in the definition of the air carrier services to be excluded from Love Field. The Ordinance by its express terms phases out air carrier *"services"* (emphasis added). The only *intra*state air carrier services to which the phase-out provision of the Ordinance applies are those services performed by carriers certificated by the TAC. With respect to carriers certificated by the CAB, however, the only air carrier "services" covered by the Ordinance are *inter*state air carrier services. The Ordinance, therefore, fails to exclude from Love Field any intrastate *services* conducted by the CAB carriers.

Since the phase-out provision of the 1968 Ordinance applies only to intrastate services provided by Southwest Airlines, and not to such intrastate services provided by others, it must be deemed to be unjustly discriminatory.

Once again, what is important in assessing Plaintiffs' contention of reasonableness is whether the purely intrastate services of carriers other than Southwest are actually excluded from Love Field by the Ordinance, not whether by choice, contract, or regulatory order, those carriers will, in fact, operate from the Regional Airport in whole or in part. These considerations inexorably lead the Court to the conclusion that the phase-out provision of the 1968 Concurrent Bond Ordinance would be unjustly discriminatory if applied to Southwest Airlines.

Secondly, even if the classification scheme involved in the 1968 Ordinance accomplished what Plaintiffs contend, this Court would still have to find it unreasonable in other respects.

The evidence shows that after the Regional Airport becomes operational, aircraft of every size and description will be permitted to continue using Love Field. There will be no restriction placed on the frequency of flights at Love, which is presently certificated for I.F.R. and V.F.R. operations and will not be downgraded after the opening of the Regional Airport. Braniff will continue to use its Love Field maintenance base for maintenance work on its fleet. All sizes of planes can use Love Field for ferry flights and refueling stops, and private aircraft of all sizes and kinds will be positively encouraged to use Love Field. Moreover, charter flights carrying passengers for hire on an unscheduled basis will continue to operate out of Love Field without restriction on the size of the aircraft they may use or on the frequency of their flights. As already noted, the scheduled commuter air services (intrastate and interstate) furnished by air taxi operators will be permitted to continue at Love after the move to Regional. In short, some of the operations to remain at Love Field will use planes larger than Southwest's; some will use planes noisier than Southwest's; some will use planes identical to Southwest's; and, indeed, some of the aircraft operations may be on a scheduled basis and compete in markets which Southwest presently serves. The question before the Court is whether, under these circumstances, Plaintiffs can exclude Southwest from Love Field in the face of the express statutory prohibitions against both unjust discrimination and the grant of an exclusive right to use the facilities of Love Field.

The "unjust discrimination" and "exclusive right" prohibitions were considered in Judge Dooling's decision in Aircraft Owners and Pilots Association v. Port Authority of New York, 305 F. Supp. 93 (E.D.N.Y.1969), a case involving the exaction of a $25.00 fee for General Aviation aircraft landing or taking off during the peak traffic periods at the three major airports in the New

York metropolitan area. The suit was brought by owners of private aircraft to invalidate the landing fee on the grounds that it "unjustly discriminated" against general aviation in favor of commercial airlines. While the Court ruled that the landing fee was not unjustly discriminatory on the facts of the case before it, the rationale for its decision makes it abundantly clear that, on the facts of this case, Plaintiffs have unjustly discriminated against Southwest and have impermissibly granted an exclusive right to use Love Field to those allowed to remain there after Southwest's exclusion.

It is clear from the *Port Authority* opinion that the decisive factor in the Court's ruling was the well-recognized preference which commercial air traffic enjoys over all other classes of aviation. As the Court said:

"But in any contest that had to be resolved in terms of the public convenience and necessity, a resolution in favor of the mass transportation carriers as against general aviation was the dictate of simple reason." 305 F. Supp. at 108.

The Court's conclusion that a definite preference existed for mass transportation over private aircraft was buttressed by established FAA policy and by the Federal Aviation Act itself. Insofar as that Act was concerned, the Court noted that this preference was justified by 49 U.S.C. Sec. 1304, which states that:

"There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit through the navigable airspace of the United States."

Since commercial aviation represents the right of a greater number of people to use the navigable airspace of the United States, implementation of the Congressional policy requires a preference for commercial aircraft over private aircraft (and by implication over air cargo).

This preference for commercial aircraft is also supported by FAA regulations, see 33 Fed.Register 17,897, from which the Court quoted extensively in the *Port Authority* opinion. As the FAA stated:

"When capacity limitations compel a choice, however, the public service offered by the common carrier must be preferred."

The second element which Judge Dooling considered in evaluating the legality of the Port Authority's $25.00 landing fee was whether the imposition of such fee resulted in a reasonable limitation of a particular airport use or the complete exclusion of that use.

In this regard, Judge Dooling made specific note of two points in his discussion concerning the reasonableness of the fee imposed: (1) the fact that the fee was not in effect at all times, but only at certain peak traffic hours; and (2) the fact that even with the imposition of the higher fee, some general aviation activity continued during such peak traffic periods. As the Court observed:

"The fee schedule, however, . . . does not exclude any General Aviation aircraft from the three major airports either during off-peak hours or even during peak hours." 305 F.Supp. at p. 107.

The Court's care in noting that no outright exclusion of any class of aeronautical use was involved in the case demonstrates that such an outright exclusion, if permissible at all, would certainly bear a heavy burden of justification.

In the case at bar, Plaintiffs have attempted to subject the priorities which were so prominent in the *Port Authority* case to a radical inversion. In place of the preference accorded mass transportation in that case, Plaintiffs herein, in determining who shall have access to Love Field, have preferred private aircraft, corporate jets, unscheduled cargo flights, maintenance flights, and ferry flights over Southwest's commercial air service. Plaintiffs do not purport to maximize public access to a public air-

port supported by federal funds. Instead, they overtly declare their purpose to be the suppression of competition in pursuit of a purely economic advantage for the Regional Airport. As the 1968 Bond Ordinance itself states in Section 9.5A thereof:

> "It is acknowledged and understood by the Cities that they, in Love Field, Redbird, GSIA and Meacham Field, own and operate airports which by their nature are potentially competitive with the operation of the Regional Airport . . . . Accordingly, the Cities . . . shall take . . . steps . . . to provide for the orderly, efficient and effective phase out [of Certificated Air Carrier Services at the above named airports]."

This must be contrasted with the *Port Authority* case, where the justification for the restrictive action taken was a severe shortage of airport capacity, a situation which will not exist in the Dallas/Fort Worth Region in the foreseeable future and which makes mandatory a choice between different classes of rights.

It is readily apparent from the face of the 1968 Ordinance that the Cities' only reason for barring Southwest Airlines from Love Field is to avoid the potential competitive effect on the Regional Airport (*i. e.*, the CAB carriers serving it), regardless of the public's interest in the continuance of convenient and economical short haul commuter air service. This attempted justification is directly contrary to the policy underlying the federal prohibition of the grant of an exclusive right at airports upon which federal funds have been expended. As

then U. S. Attorney General Robert H. Jackson declared:

> "Legislative history shows that the purpose of the provision is to prohibit monopolies and combinations in restraint of trade or commerce and to promote and encourage competition in civil aeronautics in accordance with the policy of the Act * * * The grant of an exclusive right to use an airport for a particular aeronautical activity, such as an air carrier, falls within Section 303 proscribing any exclusive right for use of any landing area."

On the facts herein, the Court must conclude that a prima facie case of "unjust discrimination" and of the illegal grant of an "exclusive right" has been established and that Plaintiffs' purported justifications therefor are inadequate.[7]

 First, with respect to justification, Plaintiffs herein may not claim, as Defendant did in the *Port Authority* case, that the exclusion of Southwest from Love Field serves the "public interest." The TAC, which is charged by statute with determining the public convenience and necessity in the area of intrastate air transportation, has granted Southwest a certificate empowering it to serve "any" airport of its choice in the Dallas/Fort Worth area and, through Minute Order No. 22, has prohibited Southwest from discontinuing service to Love Field. The Commission's judgment in these matters is not subject to challenge before this Court. Although Plaintiffs appeared before the CAB with respect to the amendment of the certificates of the interstate air carriers so as to designate single airport service, they

---

7. A prima facie case of unjust discrimination may be said to exist where, in the terms of the grant agreements, the Sponsor fails to "keep the Airport open to all types, kinds, and classes of aeronautical use without discrimination between such types, kinds, and classes . . . ."

This interpretation of a prima facie case of unjust discrimination is consistent with the interpretation Courts have given that term

under Sec. 1374(b) in passenger cases. In those decisions, the Courts have held that a preference for one passenger over another makes out a prima facie case of "unjust discrimination" sufficient to impose the burden of justification on the air carrier. See Archibald v. Pan American Airways, Inc., 460 F.2d 14, 16 (9th Cir. 1972). *Cf.* Wills v. Trans World Airlines, Inc., 200 F.Supp. 360 (S.D.Cal.1961).

have not attempted to secure similar action by the TAC concerning Southwest. The TAC's existing determination that the public interest requires Southwest to serve Love Field must therefore be deemed conclusive and not subject to collateral attack in this action. See Tampa Phosphate R. Co. v. Seaboard Coast Line R. Co., 418 F.2d 387, 398–399 (5th Cir. 1969), cert. denied, 397 U.S. 910, 90 S. Ct. 907, 25 L.Ed.2d 90 (1970); Thompson et al. v. Texas Mexican Ry. Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946).

 Secondly, Plaintiffs' purely economic justification for excluding Southwest Airlines from Love Field must yield to the recognized preference for commercial air traffic and to the TAC's determination of where the public interest lies in the area of intrastate air transportation.

Thirdly, Plaintiffs' unsystematic classification discriminates not only between different types and kinds of aeronautical use, but also between uses within the same general class as well. Such discrimination is particularly objectionable because of the anti-competitive effects it has on the airlines and the public they serve.[8] Plaintiffs have broken up the class of commercial passenger service into several subclasses with no consistent rationale throughout. Charter flights, which may use larger or smaller aircraft than Southwest Airlines, may remain at Love Field, while Southwest Airlines must go. Air taxis, which hold certificates of public convenience and necessity from the TAC, may stay at Love Field although they operate a short-haul passenger service according to published flight schedules. However, Southwest Airlines, which holds the same kind of certificate from the TAC and also operates a short-haul passenger service according to published flight schedules, must go.[9]

Most egregious of all is the distinction the 1968 Ordinance makes between the carriage of intrastate passengers by Southwest Airlines and the carriage of such passengers by its CAB certificated competitors. As discussed above, this is a per se discrimination clearly violative of the federal statutes.

Finally, the attempt to exclude Southwest Airlines from Love Field is particularly irrational and inherently "unjust" because it removes to a more remote airport the one kind of passenger service which has most need of a close-in airport. It is virtually undisputed that short-haul air service of the type involved in Southwest's only markets is far more vulnerable to competition from private automobiles, buses, and trains than long haul air service. As a result, the increased passenger ground transportation time and expense resulting

8. The uncontroverted evidence shows that Southwest's presence in the short-haul market, and particularly at close-in Hobby Airport in Houston, has generated vigorous competition among the various carriers on the routes which Southwest serves, resulting in a greatly expanded short-haul commuter market and in very substantial savings to the traveling public.

9. This distinction between air taxis and Southwest Airlines is even less defensible when one considers that the air taxis carry interline passengers, destined out of state, who must connect with CAB carriers to complete their journeys, while Southwest is prohibited by law from carrying interstate connecting passengers. This difference in carrier authority would militate strongly in favor of removing the air taxis to the Regional Airport so that they will be near the CAB carriers, cf., Aircraft Owners and Pilots Association v. Port Authority, supra, 305 F.Supp. at 107, and allowing Southwest to remain at Love Field, rather than the reverse.

The only other difference between Southwest Airlines and the air taxis is the size of the aircraft each uses. Even this has been blurred, however, as the result of a recent (September, 1972) change in the CAB regulations which permits air taxi operators to utilize aircraft with a maximum capacity of 30 passengers and a maximum payload (passengers, baggage, and freight) of 7,500 pounds. Thus, for the first time, these carriers can effectively compete with Southwest Airlines, especially if Southwest is forced to operate from the distant Regional Airport, while the air taxis use Love Field.

from using an inconvenient airport is more likely to discourage a short-haul, intrastate commuting passenger from using the airways than a long haul interstate passenger, in whose case the time and expense of going to and from an airport constitutes only a relatively small part of his total trip time and expense. Considerable evidence presented at the trial showed that travel time and expense to the Regional Airport will be significantly greater for the vast majority of air travelers in the Dallas-Fort Worth area than travel time and expense to Love Field and that an overwhelming majority of Southwest's passengers preferred Love Field. It also showed that none of the Plaintiffs had studied this problem or surveyed passenger preferences and that elsewhere in the country, where dual airport services existed, the short-haul commuter carriers were authorized to serve the close-in airport while long haul service was provided through the outlying airport. Consequently, this Court concludes that excluding Southwest's strictly short haul service from Love Field, while allowing long haul flights by charter carriers, corporate jets, and others to remain there, is unjustly discriminatory within the meaning of the federal statutes, and improperly grants an exclusive right to the aircraft users who will be eligible to use Love Field after the Regional Airport opens. See 40 Op.A.G. 71 (June 4, 1941).[10]

Wholly apart from the federal grounds set forth above, the exclusion of Southwest from Love Field is prohibited by state law.

The City of Dallas, owner and operator of Love Field, is a creation of the State of Texas, and, under the Texas Constitution, may only enact ordinances and charter provisions which do not:

" . . . contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State; . . .." Texas Constitution, Art. 11, Sec. 5, Vernon's Ann.St.[11]

Additionally, the State has expressly granted the city certain powers to regulate airports pursuant to the Municipal Airports Act, Art. 46d-1 through 46d-22, V.A.C.S. This power to regulate airports is, however, specifically circumscribed by the same Municipal Airports Act:

"(b) Conformity to Federal and State law. No ordinance, resolution, rule, regulation or order adopted by a municipality pursuant to this Act shall be inconsistent with, or contrary to, any Act of the Congress of the United States *or laws of this State, or to any regulations promulgated or standards established pursuant thereto.*" (emphasis added) Art. 46d-7(b) V.A.C.S.

The Texas Aeronautics Commission has intervened in this matter and adopted the contentions of Southwest Airlines. It most specifically urges that the Plaintiffs' attempted exclusion of Southwest from Love Field is illegal as being, first, beyond the power of the Plaintiffs, and, second, in direct conflict with regulations promulgated pursuant to the laws of the State of Texas.

The Texas Aeronautics Act, Art. 46c-1 et seq., V.A.C.S., delegates to the TAC the unqualified authority to regulate scheduled intrastate carriers and directs it to consider "the encouragement and development of an intrastate air trans-

10. In addition to the federal statutes discussed above, Defendant has argued that its proposed exclusion from Love Field violates 49 U.S.C. Sec. 1374(b); the equal protection clause of the United States Constitution, its right to travel, and its right of access to the navigable airspace of the United States. Defendant has also argued that the Dallas Ordinance discriminates against its passengers on the basis of wealth. The Court finds no need to reach and decide these points due to the disposition of Defendant's claims on other grounds.

11. See also, Art. 1165, V.A.C.S., relating to Home Rule Cities, which provides in pertinent part: "No charter or any ordinances passed under said charter shall contain any provision inconsistent with the Constitution or general laws of this state."

portation system properly adapted to the present and future needs of the State of Texas." Art. 46c–6, Subd. 3(b), V.A.C.S. In conducting its regulatory activities, the TAC is charged with determining, and providing for, the public convenience and necessity of the citizens of the *entire State* with respect to routes, fares, schedules, and all other relevant aspects of intrastate air service or proposed air service. Plaintiff Cities neither conducted polls nor made investigations or held hearings of any kind to determine *public* convenience and necessity insofar as the Dallas/Houston, Dallas/San Antonio flights of Southwest are concerned, and it might be pointed out that such investigation would involve air travelers of Houston and San Antonio as well as those of Dallas. Indeed, the governing bodies of the Cities would have neither the time nor the expertise to hold hearings and make such determinations. Beyond any question, the TAC is the sole authority for the purpose of determining the public interest and needs with respect to Texas intrastate air service. Texas Aeronautics Commission v. Braniff Airways, Inc., 454 S.W.2d 199 at 201 (Tex.Sup.1970).

Any effort by Plaintiffs to regulate the service of a TAC carrier (*e. g.*, Southwest Airlines) impinges upon the jurisdiction of the TAC and is therefore invalid under Art. 11, Sec. 5 of the Texas Constitution, Art. 1165, V.A.C.S. and Art. 46d–7(b), V.A.C.S.[12] Moreover, the conflict between state and municipality in the instant case is even more direct. The TAC granted Southwest a Certificate of Public Convenience and Necessity to serve Dallas, Texas, through "any" airport in the area. Subsequently, the TAC ordered Southwest not to discontinue service to any airport then being served, without the prior approval of the TAC. TAC Minute Order No. 22, November 12, 1971. On November 12, 1971, Southwest was serving Love Field. The granting of the Certificate and the promulgation of Minute Order No. 22 establish the determination of the TAC that the public's convenience and necessity require that Southwest continue serving Dallas through Love Field. Plaintiffs' attempt to ignore the

---

12. *Defendants point out that the regulation of intrastate carriers under the guise of regulating airports could have a very substantial effect upon aeronautical activity in the State as a whole; e. g., should Dallas be permitted to refuse Southwest Airlines access to Love Field, the effect would be felt not only by the citizens of Dallas, but also by the citizens of Houston and San Antonio. They further point out that there are approximately 200 municipal airports in the State of Texas and that, if each municipality were permitted to limit the use of its airport as it wishes, then there would, in effect, be 200 regulatory bodies empowered to determine "the present and future needs of the State of Texas." No intrastate air transportation system could possibly be developed under such chaotic regulatory conditions, and the rationale for a single state agency to regulate all aspects of intrastate air service is obvious.*

*Additionally, Southwest's type of air service is unique to the State of Texas and was inaugurated only after three and one-half years of litigation involving questions of public convenience and necessity, among others. Southwest's President testified that*

the Company would not be in existence today had it continued to serve Houston's outlying Intercontinental Airport rather than Houston's close-in Hobby Airport. It would ill-suit the public convenience and necessity of the citizens of the State if Dallas were permitted to force Southwest to the Regional Airport, thereby causing the demise of a Company which offered convincing evidence at the trial that it has provided superior commuter air service at lower fares. The Court makes no findings of fact on this issue, which is discussed simply in order to illustrate why the TAC, which has experience and expertise in such matters, should make the final determination concerning them. See Thompson et al. v. Texas Maxican Ry. Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946) and the September 2, 1969 Opinion of the Texas Attorney General wherein he states that the Texas Aeronautics Act "subordinates, so far as for-hire air transportation is concerned, the general power of cities to regulate commerce within their boundaries." See also City of Dallas et al. v. CAB, 944 U.S.App.D.C. 175, 221 F.2d 501 (1954), cert. denied 348 U.S. 914, 75 S.Ct. 295, 99 L.Ed. 717.

actions and jurisdiction of the TAC, by requiring Southwest to cease providing service through Love Field, is in direct conflict with such actions and jurisdiction and, therefore, beyond Plaintiffs' powers. There is abundant authority establishing that in conflicts between municipalities and regulatory agencies, both creations of the State of Texas, the regulatory agency must prevail. City of Arlington v. Lillard, 116 Tex. 446, 294 S.W. 829 (1927); City of Fort Worth v. Lillard, 116 Tex. 509, 294 S.W. 831 (1927).

■ For the foregoing reasons, the Court concludes: (1) That determinations of public convenience and necessity respecting intrastate air commerce are exclusively within the jurisdiction of the TAC; (2) that exclusion of Southwest Airlines from Love Field constitutes an impermissible assumption by Plaintiffs of the power to amend Southwest Airlines' certificate of public convenience and necessity, contrary to the exclusive powers over such certificates conferred upon the Texas Aeronautics Commission by the Texas Aeronautics Act; and (3) that Section 9.5 of the 1968 Regional Airport Concurrent Bond Ordinance and the ordinances supplemental thereto are in conflict with, and must yield to, the TAC's Minute Order No. 22, insofar as these Ordinances purport to authorize the exclusion of Southwest Airlines from Love Field.

■ Finally, the Plaintiffs are prohibited from excluding Southwest Airlines from Love Field by prior legal commitments and covenants entered into by the City of Dallas. The City has issued several series of Airport Revenue Bonds for the purpose of financing construction at Love Field. In at least three of these series (364, 401, and 409), some $8.9 million of which are presently outstanding and unpaid, the City covenanted with the bondholders (including Southwest Airlines) as follows:

"That while any of the Revenue Bonds or interest thereon are outstanding and unpaid, the City will continue to operate and maintain or cause to be operated and maintained the Airport [Love Field] as an airport for the accommodation of *scheduled airlines* serving the City . . . ." (emphasis added)

In addition to the Love Field Airport Revenue Bonds, Dallas has sold several series (363, 370, 371, and 390) of Love Field Maintenance Base Bonds, of which approximately $25 million are outstanding and unpaid and in which it covenanted with the bondholders as follows:

"The City will continuously operate its Airport at Love Field, and will not cause or suffer curtailment of the *general* use thereof so long as any of the Revenue Bonds or any interest thereon remains outstanding and unpaid." (emphasis added)

The exclusion of Southwest Airlines from Love Field would breach each of these covenants. The fact that circumstances may have changed and that Dallas would now like to ignore its prior covenants does not provide an adequate basis for the City's proposed action. Such obligations are binding and the City must adhere to them. City of Houston v. Mann, 139 Tex. 640, 164 S. W.2d 548 (1942).

The Plaintiffs assert that the covenants in the Love Field Airport Revenue Bonds are satisfied by making these three series of bonds senior to the Dallas/Fort Worth Regional Airport Bonds with respect to Regional Airport revenues. It is quite clear from the language of these covenants, however, that such an interpretation has no merit. Furthermore, even if such interpretation were meritorious, the City's proposed actions would still be precluded by the covenants in the four series of Love Field Maintenance Base Bonds.

In reaching its decision, the Court finds it unnecessary to invalidate Section 9.5 of the 1968 Regional Airport Concurrent Bond Ordinance, since that Ordinance authorizes Plaintiffs to phase out Certificated Air Carrier Services only to the extent that such action is "le-

gally permissible" and not in violation of "presently outstanding legal commitments or covenants prohibiting such action." Since the Court has found that the exclusion of Southwest Airlines from Love Field would not be legally permissible, in part because it would violate presently outstanding legal commitments or covenants, the phase-out provision of the Ordinance is declared not applicable to Southwest Airlines.

As the Court is confident that Plaintiffs will abide by its ruling in this case and not attempt to interfere with or burden Southwest's right to use Love Field, an injunction to enforce its decree is deemed unnecessary.

It is accordingly ordered and declared that Plaintiffs herein may not lawfully exclude Defendant, Southwest Airlines Co., from the use of Love Field, Dallas, Texas, and its airport facilities so long as Love Field remains open as an airport.