The **CITY OF DALLAS**, the City of Fort Worth, and the Dallas-Fort Worth International Airport Board, Appellants,

v.

**CONTINENTAL AIRLINES, INC., Appellee.**

No. 05–86–01293–CV.

Court of Appeals of Texas, Dallas.

June 12, 1987.

Rehearing Denied July 23, 1987.

Kelly M. Massad, Dallas/Fort Worth, Paul K. Pearce, Jr., Dallas, Janet L. Pearson, Fort Worth, for appellants.

Nina Cortell, George W. Bramblett, Mark R. Kolitz, Dallas, for appellee.

Before DEVANY, STEWART and HECHT, JJ.

DEVANY, Justice.

This is an appeal from a suit brought by Continental Airlines, Inc., to declare that there is no legal impediment to Continental's offering certain air passenger services to and from Dallas Love Field Airport and to require the City of Dallas to negotiate with it for leasing of airport space at Dallas Love Field Airport. The City of Fort Worth and the Dallas-Fort Worth International Airport Board intervened on the side of the City of Dallas. Continental Airlines filed a motion for summary judgment which was granted by the trial court. In this appeal, the City of Dallas raises six points of error; the City of Fort Worth raises eight points of error; and the Dallas-Fort Worth International Airport Board raises three points of error. The trial court's judgment is affirmed.

## HISTORICAL BACKGROUND

Before we address the issues raised in this appeal, it is necessary to discuss the historical background of this case. Until 1973, the cities of Dallas and Fort Worth were served by a number of different airports, including Dallas Love Field, Redbird, Fort Worth's Meacham Field, and Greater Southwest International Airport (GSIA). Before that, competition between the two cities for air travelers was fierce, and the public and the air carriers were greatly inconvenienced by the division of services. In 1962, the Civil Aeronautics Board (CAB) conducted an investigation of the situation and concluded that the cities would best be served by a single, large regional airport. In 1964, the CAB gave Dallas and Fort Worth one hundred eighty days to reach an agreement as to which airport would serve the area. The cities were informed that if they failed to reach an agreement the CAB would designate either Love Field or GSIA as the sole regional airport.

In response to the CAB's urgings, the cities decided to construct and operate a new regional airport rather than name an existing airport as the regional airport. The new airport, Dallas-Fort Worth Regional Airport (DFW), which was later renamed Dallas-Fort Worth International Airport, was to be located approximately midway between Dallas and Fort Worth at Grapevine, Texas. In order to fund the

new airport, the cities jointly adopted the 1968 Regional Airport Concurrent Bond Ordinance. The Ordinance provides at section 9.5 that:

> [the cities] ... shall take such steps as may be necessary, appropriate and legally permissible (without violating presently outstanding legal commitments or covenants prohibiting such action), to provide for the orderly, efficient and effective phase-out at Love Field, Redbird, GSIA and Meacham Field, of any and all Certificated Air Carrier Services, and to transfer such activities to the Regional Airport effective upon the beginning of operations at the Regional Airport.

The ordinance also defined "Certificated Air Carrier Services" as follows:

> (1) *inter*state services conducted by commercial air carriers according to published flight schedules and holding certificates of public convenience and necessity or similar evidences of authority issued by the *Civil Aeronautics Board* of the United States of America or any successor agency thereto;
>
> (2) services conducted by foreign air carriers according to published flight schedules holding permits or similar evidences of authority issued by the Civil Aeronautics Board or any successor agency thereto or by any other agency or department of the United States of America; and
>
> (3) *intra*state services conducted by commercial air carriers according to published flight schedules and holding certificates of public convenience and necessity or similar evidences of authority issued by the *Texas Aeronautics Commission* of the State of Texas or by any successor agency.

(Emphasis added).

In 1970, Continental and Texas International Airlines (which later merged with Continental) signed a Letter Agreement with the Dallas-Fort Worth Airport Board which provided that each signatory airline would:

> move all of its *Certificated Air Carrier Services* serving the Dallas-Fort Worth area to [DFW] ... *to the extent re-quired under the terms of the ... Bond Ordinance.*

(Emphasis added.) All the other CAB-certificated carriers signed similar Letter Agreements. In 1979, Continental Airlines' predecessor, Texas International Airlines, Inc., also signed a Use Agreement containing the same provisions.

In 1971, Southwest Airlines Company, then a small commuter airline, began offering services from Dallas Love Field to San Antonio and to Houston. Southwest was *not* a CAB-certificated carrier, but rather a Texas Aeronautics Commission (TAC) certificated carrier. Southwest obtained a certificate of public convenience from the TAC which authorized Southwest to fly out of any airport in the Dallas-Fort Worth area. Southwest began operations at Love Field but planned to move to DFW. However, shortly after that the TAC issued an order which directed all TAC-certificated carriers not to change the airports from which they were operating without written approval from the TAC. In October of 1971, Southwest Airlines notified the DFW Board that it intended to remain at Love Field after the other CAB-certificated carriers moved to DFW. Accordingly, Southwest declined to execute the letter agreement signed by the CAB carriers.

When Southwest refused to move its operations from Love Field to DFW, the Cities of Dallas and Fort Worth and the DFW Board filed suit in the United States District Court seeking to force Southwest to move its operations to DFW. As stated earlier, section 9.5 of the Bond Ordinance required the cities of Dallas and Fort Worth to phase out certain certificated air carrier services from Love Field and move them to DFW. As stated, those services included all *TAC-certificated carriers* which conducted *intra*state services. Southwest *was* such a carrier. The case which resulted was styled *City of Dallas v. Southwest Airlines Company*, 371 F.Supp. 1015 (N.D.Tex.1973), *aff'd*, 494 F.2d 773 (5th Cir.1974), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674, *reh'g denied*, 420 U.S. 913, 95 S.Ct. 837, 42 L.Ed.2d 845 (1975) (hereinafter referred to as *South-*

*west* ). In *Southwest,* the United States District Court held that Southwest Airlines had the right to continue to operate out of Love Field notwithstanding the agreement between the cities as contained in the Bond Ordinance. The court reasoned that while the Bond Ordinance did require the phase-out of all TAC-certificated carriers providing *intra*state services at Love Field, such as Southwest, it did not require the phase-out of all *CAB*-certificated carriers providing similar intrastate services at Love Field. 371 F.Supp. at 1028. The court further reasoned that, since Love Field is a federally-funded airport, it is subject to federal prohibitions against unjust discrimination and the grant of an exclusive right. 371 F.Supp. at 1026–28, (*citing* 49 U.S.C. §§ 1110(1) and 1718(1) (1963), [*amended by* 49 U.S.C. § 2210 (1987 Supp.) ]; 50 U.S.C. App.Sec. 1622(g) (1951) [*amended by* 50 U.S.C. App. § 1622(g) (1987 Supp.) ]; and 49 U.S.C. § 1349(a) (1970 ed.)). The holding states in part that:

> [s]ince the phase-out provision of the 1968 Ordinance applies only to intrastate services provided by Southwest Airlines, and not to such intrastate services provided by others, it must be deemed to be unjustly discriminatory.

371 F.Supp. at 1028. On appeal, the United States Court of Appeals for the Fifth Circuit affirmed the judgment of the trial court. The Fifth Circuit court held that the Texas Aeronautics Commission had already spoken as to where Southwest, a TAC carrier, was to operate when it ordered Southwest not to move its operations from Love Field. That court further held that the State of Texas had given all authority over TAC carriers and their routes to TAC. Dallas, then, as a municipality under Texas law, could not countermand TAC's decision by requiring Southwest to leave Love Field. 494 F.2d at 777.

In the present case, Continental, as a *CAB-certificated* carrier, has sought for a number of years to initiate *intra*state services at Love Field. Continental states that it proposes to fly a minimum of seven round-trip flights a day between Dallas Love Field and Houston Hobby airport. The City of Dallas has resisted, however, arguing that Continental signed this right away when it signed the Letter Agreement.

The historical background in the present case further includes Congress' passage of the so-called Love Field Amendment. International Air Transportation Competition Act of 1979, Pub.L. No. 96–192, § 29, 94 Stat. 35 (1980). The Love Field Amendment provides that air carriers flying out of Love Field may fly only to points within Texas or to points within the four states which immediately surround Texas. Continental's request to fly out of Love Field met the further refusal by the City of Dallas on the ground that its proposed service would violate the Love Field Amendment. The City of Dallas points out that Continental has flights from Houston's Hobby Airport to Acapulco, Mexico; Albuquerque, New Mexico; Auckland, New Zealand; Baton Rouge, Louisiana; Billings, Montana; Boston, Massachusetts; as well as to fifty-three other destinations throughout the United States and the rest of the world. Conceivably, Continental could advertise its services as offering connecting flights from Houston's Hobby Airport to places outside the five-state area. Thus the City of Dallas expressed concern that Continental could "interline" with its flights out of Houston's Hobby Airport. "Interlining" occurs when an airline sells a single ticket to a passenger for more than one flight. For example, a person could buy a single ticket from Dallas to New York, entitling that person to fly from Love Field to Houston's Hobby Airport and then board a connecting flight with the same ticket and fly to New York's LaGuardia Airport. "Interlining" also provides passengers the extra service of automatically having their luggage transferred to the connecting flight. In contrast, "double ticketing" occurs when a passenger buys two separate tickets. In our illustration, the passenger would fly from Dallas to Houston on one ticket, retrieve his luggage from the first flight, and then board the second plane to New York on a separate ticket after he checked his luggage onto the second plane.

In light of these possibilities, the City of Dallas sought an interpretation of the Love Field Amendment from the Department of Transportation (DOT), the CAB's successor agency, with respect to Continental's request to fly from Love Field. After making its investigation and hearing from all interested parties, the DOT issued an order dated July 26, 1985, holding that Continental's proposed service from Dallas Love Field to Houston Hobby does not violate the Love Field Amendment. DOT Order 85–12–81, at 2. The DOT order further held that the Love Field Amendment does not apply to flights by intrastate carriers *or* intrastate service by an "air carrier." The order further provided that Continental could, upon a passenger's request, sell "double tickets" to authorized destinations from Love Field; however, it could not interline or list any flights as "connecting" flights from Love Field. This order from the DOT is currently on appeal in the United States Court of Appeals for the District of Columbia Circuit; however, neither the city nor Continental has applied for a stay of the DOT order; accordingly, they are bound by the order while on appeal.

## THE POINTS OF ERROR

With this essential background recited, we now consider the points of error brought by the City of Dallas, the City of Fort Worth, and the DFW International Airport Board. Because some of the points of error presented by the different parties are the same, we shall address similar points together.

## THE SUMMARY JUDGMENT PROCEDURES

■ In its first point of error, the City of Dallas claims that the trial court erred when it denied the City of Dallas' motion to strike the reply brief of Continental and the summary judgment evidence contained therein, because the brief was not timely filed in accordance with TEX.R.CIV.P. 166–A. We disagree. Continental filed a Reply Brief in Support of its Motion for Summary Judgment only three days before the hearing on its motion. Attached to that brief

were three documents representing additional summary judgment evidence. When the City of Dallas filed a motion to strike the brief, the trial court denied it.

This court has previously held that TEX.R.CIV.P. 166–A requires that, except on leave of court, the movant must serve all summary judgment evidence upon which the motion depends on all parties at least twenty-one days prior to the hearing on the motion. *Extended Services Program, Inc. v. First Extended Service Corporation,* 601 S.W.2d 469, 470 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). By requiring the non-movant to file its response seven days before the hearing, Rule 166–A presupposes that the non-movant has had at least fourteen days to obtain and to file summary judgment evidence to rebut the movant's evidence. 601 S.W.2d at 470. As this court stated:

> [t]o hold otherwise would permit the movant to take unfair advantage of the nonmovant by permitting the movant to serve his summary judgment evidence on the nonmovant on the seventh day before the hearing, thus requiring the nonmovant's response to depend upon leave of the court. This would be untenable under our summary judgment practice.

601 S.W.2d at 470.

However, in *Extended Services,* there was neither a motion requesting leave to file nor a motion to strike. In the instant case, the overruling of the motion to strike was an act by the court which implicitly gave leave to Continental to amend its motion for summary judgment. Rule 166–A provides that leave of court will permit filings even though not within the time requirements. This court recently considered a similar situation in *Lloyd's of London v. Walker,* 716 S.W.2d 99, 103 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). In that case, the court examined TEX.R.CIV.P. 63, which prohibits amendments to pleadings within seven days, except upon leave of court. The court held that, if a trial court considers a late-filed pleading, leave is presumed to have been granted. 716 S.W.2d at 103. Therefore, since the trial court denied the motion to strike, we

presume that leave of court was granted to file the supplemental brief and the attached documents. The brief was timely filed in accordance with the trial court's scheduling order, and the attached documents did not present facts new to the City of Dallas. We hold that the trial court did not err in denying the motion to strike. *See Lloyd's of London*, 716 S.W.2d at 103.

In its second point of error, the City of Dallas argues that the trial court erred in granting Continental's motion for summary judgment because the trial court also erred in overruling the City of Dallas' objections to the affidavit of Sam Ashmore. The City of Fort Worth makes this same argument in its second point of error. In its objections to Ashmore's affidavit, the City of Dallas claimed (1) that the affidavit contained expert opinions which were not admissible because Ashmore had not been identified as an expert under TEX.R.CIV.P. 166b(5)(b); (2) that the affidavit did not affirmatively show that he was competent to testify to the matters therein as required by TEX.R.CIV.P. 166–A(e); (3) that the affidavit fails to affirmatively show how Ashmore had personal knowledge of the statements contained therein; and (4) that the affidavit contains impermissible legal opinions, conclusions, hearsay, and self-serving statements. The City of Fort Worth argues that the affidavit fails to prove any essential element of Continental's cause of action. We disagree.

■ First, we address the City of Dallas' claim that the affidavit contains expert opinions. The affidavit states that Sam Ashmore is "the Vice President of Properties and Facilities of Continental Airlines, Inc." and that he has "been with Continental Airlines, Inc., or its predecessor corporation Texas International Airlines, Inc., since 1950." Ashmore's testimony gives a historical review of events leading up to this controversy and states Continental's position. It is based upon personal knowledge gained through Ashmore's employment with Continental since 1950. We hold that his testimony is not that of an expert witness as that term is used in law.

■ The City of Dallas further claims that the affidavit did not show that Ashmore was competent to testify to all the matters therein, and that the affidavit failed to show how his involvement with the airline industry would give him personal knowledge of all the statements contained in his affidavit. We disagree. The affidavit states that Ashmore is a Vice-President of Continental Airlines, and that he has been with the company or its predecessor since 1950. The affidavit also states that Ashmore is "the individual in charge of acquiring facilities to serve Love Field." These statements are plainly sufficient to show how Ashmore gained his personal knowledge and thus satisfy the requirements of TEX.R.CIV.P. 166–A. *See J.T. Fulgham Company v. Stewart Title Guaranty Company*, 649 S.W.2d 128, 130 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). In *J.T. Fulgham*, this court held that an affidavit stating that the affiant was vice-president and agent of the Stewart Title Guaranty was sufficient to show how the affiant knew of the facts therein. 649 S.W.2d at 130. We hold that Ashmore's statements in his affidavit were likewise sufficient to show how he obtained personal knowledge of the facts within his affidavit.

■ The City of Fort Worth argues that the affidavit fails to prove any element of Continental's cause of action. Fort Worth argues that Continental sought to have the trial court grant it a declaratory judgment on the basis that its proposed service at Love Field was to Houston only, and, therefore, was conclusively intrastate. Fort Worth argues that the only summary judgment evidence which supports the judgment is the following statement from Ashmore's affidavit:

> 44. If allowed access to Love Field, it is the present intent of Continental to provide a minimum of seven non-stop round trips between Love Field and Houston, Texas.

The City of Fort Worth argues that this is a mere statement of intent, and, therefore, insufficient to establish the character of Continental's proposed flights as being in-

trastate. We disagree. Continental's proposed service has been clearly defined as an intrastate service between Love Field and Hobby. The DOT order referred to above was based upon an investigation by DOT and the order contains recitations that support Ashmore's statement. If there was any evidence that Continental had other intentions, such evidence could have been used by Dallas to controvert Ashmore's statement. As we stated earlier, Ashmore's affidavit is clear and readily controvertible. Fort Worth did not controvert the facts asserted in the affidavit; therefore, summary judgment was permissible under TEX.R.CIV.P. 166–A(c).

We are not persuaded by the City of Dallas' further arguments that the affidavit contains legal opinions, conclusions and hearsay. We have thoroughly examined the affidavit and we are persuaded that it contains readily controvertible facts of which Ashmore demonstrated his personal knowledge. Therefore, the trial court did not err in overruling the City of Dallas' objections to Ashmore's affidavit. The City of Dallas' second point of error is overruled.

## INTERPRETATION OF THE BOND ORDINANCE AND THE USE AGREEMENT

In their third, fourth, fifth and sixth points of error, the City of Dallas argues that the trial court erred in granting Continental's motion for summary judgment because Continental did not show that there was no issue of material fact and that Continental was entitled to judgment as a matter of law. The City of Fort Worth makes similar arguments in its first, third, fourth, fifth, and sixth points of error, as does the DFW Board in its second and third points of error. We disagree with these arguments.

First, we will address the claims that Continental did not prove that there was no issue of material fact and that they were entitled to judgment as a matter of law with respect to the Bond Ordinance and the Use Agreement. The Cities and the Board assert that Continental failed to prove that its proposed use of Love Field is not prohibited by the Bond Ordinance or the Use Agreement. We disagree. As pointed out above, the Bond Ordinance is basically an agreement between Dallas and Fort Worth. It requires those Cities to phase out operations from various local airports and move them to the Dallas-Fort Worth Airport. It clearly does not require that the Cities move the *intra*state services of CAB-certificated air carriers from Love Field to DFW. The district court so held in *City of Dallas v. Southwest Airlines Company*, 371 F.Supp. at 1028. Although the Fifth Circuit court did not directly address this question, it agreed with the district court's analysis of the Bond Ordinance; *i.e.*, that the ordinance did not require the Cities to exclude intrastate service by CAB carriers from Love Field. 494 F.2d at 775 n. 2.

We have found further support for the district court's interpretation of the Bond Ordinance. At the time the Bond Ordinance was enacted, the Texas Aeronautics Commission did not have authority over *intra*state carriers licensed by the CAB. At that time, article 46c–6 of the Texas Municipal Airports Act provided, in part, "the Commission is granted the right, power and authority ... over only scheduled intrastate carriers not holding certificates of convenience and necessity from the Civil Aeronautics Board...." It further provided that "no intrastate air carrier shall operate within the state ... unless and until it ... has been issued a certificate to do so by the Commission." Tex.Rev.Civ.Stat.Ann. art. 46c–6(3) (Vernon 1969) (since amended).

The Bond Ordinance included only two categories which could arguably apply to Continental's proposed service: interstate service by CAB carriers, and intrastate service by TAC carriers. The Bond Ordinance failed to address the category of intrastate service by CAB carriers, a category which did exist at the time the ordinance was adopted. Therefore, we hold that the Bond Ordinance does not prohibit Dallas from leasing space at Love Field to Continental, a CAB carrier, in order that Continental may operate its purely intrastate service

out of Love Field. Furthermore, the Use Agreement requires Continental to move its air carrier services from Love Field to DFW only "to the extent required by the ... Bond Ordinance." Therefore, we further hold that the Use Agreement does not prohibit Continental from conducting its purely intrastate services at Love Field.

■ Second, the Cities and the Board contend that, even if the Use Agreement does not require Continental to move its intrastate services from Love Field to DFW, Continental failed to establish conclusively that there was no genuine issue of material fact as to whether their proposed service is *intra*state or *inter*state. Dallas argues that, in order to prove that Continental's proposed service is *intra* state, Continental must prove that no more than a *de minimus* number of passengers using Continental's service to Houston will continue traveling to destinations outside Texas. Dallas bases this argument on a number of cases decided by the CAB. The CAB has held that an air carrier service amounts to "air transportation" (defined as interstate transportation) when more than a *de minimus* number of passengers will continue traveling to points outside a state, whether the movement is by the same or a different carrier, or pursuant to interline arrangements between carriers. *See, e.g., C.A.B. v. Friedkin Aeronautics, Inc.*, 246 F.2d 173 (9th Cir.1957); *Chicago Area Service Case*, 23 C.A.B. 552, 624, 625 (1956); *Lake Tahoe Service Investigation*, 76 C.A.B. 737, 738, 755–56 (1978).

We disagree. DOT Order 85–12–81 persuades us that Continental's proposed service did not violate the Love Field Amendment and was *intra*state in character. The DOT is the CAB's successor agency; therefore, current DOT interpretation of Continental's proposed service is more persuasive than CAB decisions which are ten to twenty years old.

In DOT Order 85–12–81, the DOT considered whether Continental's proposed service from Dallas to Houston violates the Love Field Amendment. The Love Field Amendment prohibits service between Love Field and a point outside the four states which are contiguous to Texas. Because Continental has one of its major hubs in Houston, DOT had to consider the question whether the service would actually be interstate service. Logically, in reaching its conclusions, the DOT could have characterized Continental's proposed service between Love Field and Houston in only one of three possible ways:

1. The service is purely *intra*state and thus would be permitted under the Love Field Amendment;

2. The service is *inter*state, but does not extend beyond Texas and the four contiguous states, and thus would be permitted under the Love Field Amendment; or,

3. The service is *inter*state *and* extends beyond Texas and the four contiguous states, and thus would not be permitted under the Love Field Amendment.

Continental describes the proposed service as purely *intra*state. The City of Dallas contends that the service would be *nationally inter*state because Continental has nationwide interline agreements. Because Continental's Houston hub provides flights throughout the nation and its interline agreements are nationwide, we recognize the difficulty in characterizing Continental's proposed services as *inter*state, *but* limited to Texas and its four contiguous states. If Continental's proposed services were purely *intra*state, then the services would be permitted under the Love Field Amendment; however, if the proposed services were *inter*state to any extent, *i.e.*, to include the four contiguous states, then the services could not be effectively limited to the area permitted under the Love Field Amendment. We reason, therefore, that Continental's services would be permitted under the Love Field Amendment if they are implicitly purely *intra*state. This is the conclusion reached by the DOT in their Order 85–12–81, and we agree with their reasoning. This conclusion is further supported by the strict limitations contained in the DOT order which describes how Continental would have to control its operations out of Love Field to maintain a purely intrastate character. Accordingly, we overrule the Cities' and the

Board's points of error with respect to the Bond Ordinance and the Use Agreement, and hold that Continental is not precluded from flying a purely intrastate service out of Love Field.

Continental argues, however, that whether its service is intrastate or interstate is irrelevant, because the Texas Municipal Airports Act and federal law prohibit Dallas from discriminating between airlines, regulating airline routes, and granting an exclusive right to any one airline. We need not address these arguments. The only question before us is *whether Dallas may prohibit Continental from flying its proposed service from Dallas to Houston.* We are persuaded that this service is purely intrastate, and that it is not barred by the Bond Ordinance or the Use Agreement. We express no opinion as to whether Dallas may prohibit Continental from flying *inter* state out of Love Field, as that question is not before us.

The Cities and the Board present other arguments under these same points of error, attacking Continental's contentions that Dallas' actions are in violation of the Texas Municipal Airports Act and federal law. However, these arguments are based upon the theory that the Use Agreement was a contract in which Continental gave away its right to provide CAB-approved intrastate service at Love Field. Since we have determined that the Use Agreement does not prohibit Continental from so serving Love Field, we need not address these other arguments.

In its first point of error, the DFW Board argues that Continental failed to prove that the City of Dallas' refusal to allow Continental to serve Love Field is inconsistent with DOT Order 85–12–81 because the DOT only ruled that Continental's proposed flights were intrastate, not that Continental's proposed *service* was intrastate. The Board makes the same arguments raised by the Cities of Dallas and Fort Worth with respect to the character of Continental's service: that the character of the flights is determined by whether more than a *de minimus* number of passengers continue their travels to points outside the state of

Texas. The Board argues that the DOT Order did not address these issues. We disagree. The DOT Order directly considered the effects of interlining and the fact that Continental does have flights from Houston Hobby to many destinations outside the state of Texas and outside the five-state area covered by the Love Field Amendment. In fact, the DOT Order directly stated:

> [a]fter careful review of these matters, the Department has decided that: 1) Continental's proposed service between Love Field and Houston, Texas, does not violate the Love Field Amendment; 2) the Amendment does not apply to intrastate service by an "air carrier"; 3) upon the request of passengers, Continental or its agents may sell "double tickets" to passengers continuing on a different aircraft and flight beyond an authorized destination from Love Field; 4) however, neither Continental nor its agents may list in any manner, including a computer reservation system, a flight from Love Field as a "connection" to a point beyond the Love Field authorized service area; ... and 6) intrastate and air carriers may provide service between Love Field and other points within the state of Texas so long as they do not use this service to avoid the Love Field Amendment's restrictions on interstate air service.

DOT Order 85–12–81, at 2. We are persuaded that DOT did consider the issue of whether the character of Continental's proposed service is interstate, and that the DOT concluded that, as defined, it was not. We are in agreement with the DOT's reasoning and conclusion. The DFW Board's first point of error is overruled.

■ In its seventh point of error, the City of Fort Worth argues that the trial court erred in granting Continental's motion for summary judgment because Continental failed to exhaust its administrative remedies before bringing its action in the trial court. Fort Worth argues that the Bond Ordinance provides for a means whereby the DFW Board may waive the requirements of the ordinance. Section 9.5 of the Bond Ordinance provides:

From time to time hereafter, the Board may review the effect and application of such covenant, and, by concurring action of not less than eight (8) of its members, the Board may reasonably limit its scope and effect and may waive its application in specific instances if it shall first determine that such action is necessary (1) in the interests of the public safety; (2) in the interests of prudent and efficient operations at the Regional Airport; or (3) in the interests of satisfying an overriding public need for decentralized Certificated Air Carrier Services in the Dallas-Fort Worth metropolitan region considered as a whole.

Fort Worth argues that the doctrine of exhaustion of remedies requires Continental to go to the DFW Board, as the applicable administrative agency, and seek a waiver of the terms of the Bond Ordinance and the Use Agreement before bringing an action in court. *See Dallas County Appraisal District v. Lal,* 701 S.W.2d 44, 46 (Tex. App.—Dallas 1985, no writ). We disagree. Since we have held that the terms of the Bond Ordinance do not apply to Continental's proposed services, Continental did not need to go to the DFW Board to seek a waiver of the terms which did not apply to Continental. Fort Worth's seventh point of error is overruled.

In its eighth point of error, the City of Fort Worth argues that the trial court erred in denying its cross motion for summary judgment because the City of Fort Worth was entitled to judgment as a matter of law. The City of Fort Worth argues that Continental judicially admitted that it intended to fly *inter*state service out of Love Field by stating in its pleadings that its proposed service was identical in every material aspect to that offered by Southwest, and by stating in its pleadings that Southwest has expanded their service to a number of cities outside of Texas. *See Houston First American Savings v. Musick,* 650 S.W.2d 764, 767 (Tex.1983). However, since we have determined that Continental's proposed services are purely *intra*-state, we overrule this point of error.

We hold, therefore, that the trial court did not err in granting Continental's motion for summary judgment since there is no legal impediment under the Use Agreement to Continental's leasing space at Love Field for a purely intrastate CAB-approved (now DOT-approved) service.

We affirm the trial court's judgment in favor of Continental.